The MOUNTAIN STATES TELEPHONE
AND TELEGRAPH COMPANY,
Plaintiff,

v.

PUBLIC SERVICE COMMISSION OF
UTAH: Brian T. Stewart, Chairman;
James M. Byrne, Commissioner; Brent
H. Cameron, Commissioner, Defend-
ants.

No. 870057.

Supreme Court of Utah.

April 27, 1988.

Ted D. Smith, Floyd A. Jensen, Salt Lake City, for Mountain States Tel. and Tel. Co.

David L. Stott, Laurie L. Noda, Salt Lake City, for Public Service Com'n of Utah.

Brian Burnett, Salt Lake City, for Div. of Public Utilities.

John W. Horsley, Salt Lake City, for Continental Telephone Co.

Bruce Plenk, Salt Lake City, for Salt Lake Community Action Program and Utah Issues.

Stuart L. Poelman, Salt Lake City, for American Paging Co.

T. Larry Barnes, Gary B. Witt, Denver, Colo., American Tel. and Tel. Communications.

Brian L. McDougal, Salt Lake City, for Utah Cable TV Assn.

James J. Cassity, Salt Lake City, for Utah Independent Telephone Assn.

DURHAM, Justice:

This matter is before us on a petition for review of the Lifeline Rules and two related orders issued by the Public Service Commission of Utah (Commission). The Mountain States Telephone and Telegraph Company (Mountain Bell) sought review of the sections of the Lifeline Rules and orders which establish state-wide telephone carrier surcharge pooling as the means of funding the Lifeline program. This Court has jurisdiction over the matter pursuant to Utah Code Ann. § 54–7–16 (Supp.1987).

*Factual Background*

This review stems from the Commission's creation of a discounted local telephone service known as the Lifeline program. After determining that it had the authority to establish the Lifeline program, the Commission held hearings to determine how the program should be funded and administered. The Commission adopted the Lifeline Rules on December 1, 1986, and later issued two orders further detailing Lifeline procedure and rationale.

Mountain Bell requested review or rehearing by the Commission of the Rules and the subsequent orders. The Commission denied Mountain Bell's petitions.

The Lifeline program is a discounted phone service available to recipients of specified state assistance. Any telephone carrier whose monthly rate for telephone service exceeds $9.45 must establish a Lifeline service. Eighty percent of the funding for Lifeline comes from a surcharge on the local service of non-Lifeline customers of those telephone companies which offer Lifeline service. The final 20 percent of the program's cost is funded by a surcharge on intrastate tolls and access services. Money from both of these surcharges is pooled into a single, non-company-specific fund. The surcharge added to the rates charged non-Lifeline customers is thus calculated on a multicompany basis, rather than on a single-company basis. The Commission distributes the pooled funds to every company offering Lifeline service in an attempt to "equalize statewide the amount of the local service surcharge paid by customers of such carriers to fund lifeline telephone service." Utah Admin.R. 750–341–1 to –6 (1987–88).[1]

Mountain Bell does not object to the establishment of Lifeline or to its basic administrative structure. Mountain Bell does object, however, to the method by which Lifeline is funded. Mountain Bell argues that the pooling mechanism compels its non-Lifeline customers to subsidize other companies' Lifeline customers. Because there are more non-Lifeline Mountain Bell customers to support its Lifeline customers, Mountain Bell claims that the surcharge its non-Lifeline customers pay is greater than it would be if funding were accomplished on a company-specific basis. Mountain Bell argues that the Commission does not have the statutory authority to fund Lifeline by pooling, that the pooling arrangement is not proper rate making,

---

1. The Lifeline Rules were amended by the Commission in 1987 to end their linkage to the Utah Department of Social Services Standard Needs Budget for rate-setting purposes. 87–23 Utah Bull. 169. They are now correlated to the Federal Communication Commission's Link-up America Plan. See 87–24 Utah Bull. 67, 69.

and that pooling results in an illegally levied tax.

The Commission argues that it has the necessary statutory authority to fund Lifeline by pooling the surcharges pursuant to Utah Code Ann. §§ 54–4–1, –4, –5, –7, and –12 (1986). The Commission further relies on its finding that pooling is necessary in order for the Lifeline program to be workable. The public goal of universal service therefore provides additional justification for the pooling arrangement.

*Standard of Review*

This Court applies a correction-of-error standard when reviewing the Commission's interpretation of general questions of law. This standard grants no deference to the Commission's decision. *Utah Dep't of Admin. Servs. v. Public Serv. Comm'n*, 658 P.2d 601, 608 (Utah 1983); *see also Telecommunications Resellers of Utah v. Public Serv. Comm'n*, 747 P.2d 1029, 1030 (Utah 1987). Conversely, this Court grants the greatest degree of deference to the Commission's findings of basic fact and will uphold them if they are based upon evidence of any substance. *Utah Dep't of Admin. Servs.*, 658 P.2d at 608–09. For matters of ultimate fact, mixed questions of law and fact, and the Commission's interpretations of the operative provisions of the statutes it is empowered to administer, this Court extends an intermediate standard of review, upholding the Commission's findings as long as they are not outside "the tolerable limits of reason" and are not imposed arbitrarily or capriciously. *Id.* at 612 (quoting *Silver Beehive Tele. Co. v. Public Serv. Comm'n*, 30 Utah 2d 44, 46, 512 P.2d 1327, 1328 (1973)). Additionally, this Court has held that upon hearing a petition for review of a Commission order, it may only affirm or set aside the order; it may not modify or partially set aside an order. *Telecommunications Resellers of Utah*, 747 P.2d at 1030.

The Commission's decision to create a pooling method of funding was based upon statutes it is empowered to administer. *See, e.g., Williams v. Public Serv. Comm'n*, 754 P.2d 41 (1988). We therefore analyze their decision using an interme-diate standard of review. *Utah Dep't of Admin. Servs.*, 658 P.2d at 609–12. Accordingly, we grant some deference to the Commission's determination and will uphold that determination if it is within the tolerable limits of reason. *Id.*

*Statutory Authority*

■ It is well established that the Commission has no inherent regulatory powers other than those expressly granted or clearly implied by statute. *Basin Flying Serv. v. Public Serv. Comm'n*, 531 P.2d 1303, 1305 (Utah 1975). Therefore, we must examine the statutory scheme relied on by the Commission for its authority to establish pooling. The Commission first cites Utah Code Ann. § 54–4–1 (1986) in support of its broad authority to regulate public utilities. Section 54–4–1 states:

> The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility in this state, *and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction....*

(Emphasis added.) The Commission argues that this language authorizes it to act in the absence of express statutory authority. However, this statute has never been interpreted by this Court as conferring upon the Commission a limitless right to act as it sees fit. Explicit or clearly implied statutory authority for any regulatory action must exist. *See Utah Dep't of Business Regulation v. Public Serv. Comm'n*, 720 P.2d 420, 423 (Utah 1986); *Kearns–Tribune Corp. v. Public Serv. Comm'n*, 682 P.2d 858, 859 (Utah 1984); *cf. Basin Flying Serv.*, 531 P.2d at 1305.

■ Similarly, not one of the statutes granting the Commission more specific powers authorizes, either explicitly or implicitly, the kind of pooling arrangement adopted by the Commission in this case. Utah Code Ann. § 54–4–5, cited by the Commission as authority, applies by its own terms only to common carriers. "Common carriers" as defined in section

54–2–1(8) does not include telephone service providers; the term is limited to companies in the business of transportation. Therefore, although section 54–4–5 does grant the Commission the authority to establish joint rates [2] for common carriers in specified situations, such grant is neither an implied nor an express grant of authority to establish pooling in this case.

■ Utah Code Ann. § 54–4–12, also cited by the Commission, is similarly inapplicable. This section, although specifically applicable to telephone corporations, allows joint rates only where "a physical connection can reasonably be made between the lines of two or more telephone corporations ... whose lines can be made to form a continuous line of communication...." Utah Code Ann. § 54–4–12 (1986). Lifeline service involves no interconnection of the facilities of otherwise separate telephone companies. When physical connection of the facilities of telephone companies in regard to a specific service does not exist, this statute does not confer authority to establish joint rates.[3]

■ Lastly, the Commission cites Utah Code Ann. § 54–4–7 in support of pooling. Again, this statute does not support the Commission's actions. Section 54–4–7 states:

> Rules, equipment, service—Regulation after hearing.
>
> Whenever the commission shall find, after a hearing, that the rules, regulations, practices, equipment, appliances, facilities, or service of any public utility, or the methods of manufacture, distribution, transmission, storage or supply employed by it, are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the commission shall determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and shall fix the same by its order, rule or regulation. *The commission, after a hearing, shall prescribe rules and regulations for the performance of any service* or the furnishing of any commodity of the character furnished or supplied by any public utility, and on proper demand and tender of rates *such public utility shall furnish such commodity or render such service within the time and upon the conditions provided in such rules.*

(Emphasis added.) Although the emphasized language, when read separately from the rest of the statute, might be construed to permit pooling, the statute as a whole appears to be directed at the regulation of the physical equipment of a public utility and the safety of its operation. The emphasized language is related to the first sentence of the statute, which deals solely with the regulation of facilities and operational practices. The title of the statute, "Rules, equipment, service—Regulation after hearing," implies that the statute allows the Commission to regulate the previously established practices of a public utility. Viewed as a whole, section 54–4–7 allows the Commission to regulate and supervise services and commodities; the statute does not authorize the Commission to cause public utilities to provide new services and commodities at the Commission's behest and according to the methods the Commission deems desirable. Therefore, as with the previously examined statutes, section 54–4–7 does not grant the Commission the power to pool Lifeline surcharges from all participating companies.

### Rate Making Authority

■ Utah Code Ann. § 54–4–4 (1986) gives the Commission broad discretion in establishing rates for public utilities. *See Kearns–Tribune Corp. v. Public Serv.*

---

**2.** The Commission's argument implies that authority to establish a joint rate scheme confers authority for a pooling funding mechanism in physical connection cases. We do not reach this issue, as we have determined that section 54–4–5 is inapplicable as a grant of authority to establish pooling in nonconnection cases.

**3.** Again, we do not address the issue of whether authority to establish joint rates implies authority for pooling, as this statute is otherwise inapplicable to the case at issue.

*Comm'n,* 682 P.2d at 859, 860. Any activities that are related to rate making are therefore subject to the Commission's broad powers in this area. The pooling mechanism may be sustained if it is "closely connected to [the] supervision of the utility's rates and ... the manner of the regulation is reasonably related to the legitimate legislative purpose of rate control for the protection of the consumer." *Id.* at 860.

While we agree that the public policy supporting the Commission's rules and orders establishing pooling is a valid concern, we find that this pooling procedure cannot be justified as part of the Commission's broad rate-making authority. Although the pooling of surcharges is connected to the supervision of rates as an attempt to maintain lower rates for non–Lifeline customers of independent companies, it is nevertheless an attempt to interrelate the rates of several otherwise unconnected companies, something not contemplated by the statutory language. Section 54–4–4, discussing the classification and fixing of rates, speaks of the process and authority as applicable to individual companies only; the statute mentions the rates of "any public utility." The connection between regulation of the rates of a single utility company and the pooling of surcharges from several companies is not sufficiently close to justify the pooling.

In *Maine Water Co. v. Public Utils. Comm'n,* 482 A.2d 443 (Me.1984), the Maine Supreme Court held that the Public Utilities Commission had erred in allowing large expenses in one division of the Maine Water Company to be absorbed by increasing the rates charged customers of the company's other divisions. In order to avoid a major rate increase for the revenue-losing division's customers, the Commission established a "rate design" in which the excess cost of service of the single division was shifted to customers of the remaining four divisions. *Id.* at 455. The court, in overruling the Commission's rate decision, stressed the fact that each division of the water company was a separate operational entity and that rate making should not be used to shift the burden of losses from the customers who receive the benefits of service to another class of customers. *Id.* at 456.

In this case, the reasons for avoiding cross-subsidization are even clearer. The pooling structure at issue results in a burden on customers of companies unrelated to the company to whose customers the benefits flow, not simply a burden on customers from other divisions of a single company. Additionally, the manner of regulation in this case is not "reasonably related to the purpose of rate control for the protection of the consumer." Although pooling may be beneficial to the non-Lifeline customers of the smaller independent telephone companies operating in Utah, it results in an increase in the Lifeline surcharge Mountain Bell's non-Lifeline customers must pay. In light of the pooling mechanism's unequal effect on different classes of customers, we cannot say that the funding method is reasonably related to rate control and is done for the protection of all consumers.[4]

*Public Policy*

The Commission justifies the pooling as necessary in order to achieve universal service, or telephone service to all eligible households in the state. Without a pooling arrangement, it argues, non-Lifeline customers of independent companies would be forced to pay an extremely high surcharge, thus making the program unworkable.[5] We agree that universal ser-

4. Because we find no statutory authority for the pooling of surcharges, we do not address Mountain Bell's claim that the pooling is an illegally imposed tax.

5. Although both the Commission and Mountain Bell utilized different percentages of potential Lifeline customers to bolster their respective arguments, those relied upon by the Commission actually seem to work against its public policy argument. If the percentages it cites are correct (6.38 percent of Mountain Bell's customers eligible for Lifeline service and 7.85 percent of Contel's customers), the possibility of non-Lifeline user drop-off due to increased surcharges is only negligibly greater for customers of independent companies than for those of Mountain Bell.

vice is a desirable end. Increasing the number of households in Utah with telephone service decreases public costs and conserves public resources.

However, although desirable, public policy goals standing alone cannot support the Commission's pooling order. Without clear statutory authority, the Commission cannot pursue even worthy objectives for the public good. If the Lifeline program is in fact not feasible in the absence of pooling, the appeal to save the program must be made to the state legislature. The legislature can act to preserve Lifeline by statutorily granting the Commission the power to order multicompany pooling. Based upon their current statutory authorization, the Commission's decision exceeded the "limits of reason."

The Lifeline Rules and orders of the Commission are reversed, and this action is remanded for further proceedings consistent with this opinion.

HALL, C.J., and HOWE and ZIMMERMAN, JJ., concur.

STEWART, Associate C.J., dissents.

Bryan L. McDougal, Salt Lake City, for plaintiffs and appellants.

Carman E. Kipp, Gregory J. Sanders, Salt Lake City, for St. Mark's Hosp.

Stewart M. Hanson, Jr., Francis J. Carney, Salt Lake City, for Don Van Steeter, M.D.

P. Keith Nelson, Salt Lake City, for Toshiko Toyota, M.D.