Winston BRYANT, Attorney General for the State of Arkansas
*v.* ARKANSAS PUBLIC SERVICE COMMISSION

CA 95-629 941 S.W.2d 452

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered April 9, 1997

74

*Winston Bryant*, Att'y Gen., by: *Shirley E. Guntharp*, Deputy Att'y Gen.; *M. Shawn McMurray*, Deputy Att'y Gen.; and *Virginia H. Castleberry*, Ass't Att'y Gen., for appellant.

*Connie Griffin Carroll*, for appellee Arkansas Public Service Commission.

*Kathleen D. Alexander*, Gen. Counsel; *Charles D. Harder*, Ass't Gen. Counsel; and *Wright, Lindsey & Jennings*, by: *N.M. Norton Jr.* and *J. Mark Davis*, for appellee Arkansas Louisiana Gas Company.

JOHN E. JENNINGS, Judge. This appeal results from Order No. 8 entered by the Arkansas Public Service Commission (Commission) in Docket No. 94-175-U, which approved a Joint Proposed Stipulation (Stipulation) entered into by Arkansas Louisiana Gas Company, a division of NorAm Energy Corporation (Arkla), the Staff of the Arkansas Public Service Commission (Staff), and Arkansas Gas Consumers (AGC). The Stipulation allowed Arkla to raise its overall rates by $6,976,606 and allocated these rates among Arkla's various classes of ratepayers. The Attorney General was also a party to the proceedings but objected to the Commission's adoption of the Stipulation and brings this appeal. He contends that the Stipulation's allocation of the rate increase is not supported by substantial evidence; that the Stipulation's provision allowing Arkla to recover its corridor rate costs from all ratepayers is an abuse of the Commission's discretion and unreasonably and illegally discriminatory; and that the allocation of the corridor rate costs among the ratepayers is not supported by substantial evidence. We affirm the decision of the Commission.

In May 1994, Arkla filed an application with the Arkansas Public Service Commission for an annual rate increase of approximately $10 million. Docket No. 94-175 was established, AGC was granted intervenor status in the docket, and the Attorney General notified the Commission of his intent to participate in the proceedings. Staff then began conducting an extensive audit and analysis of Arkla's application, books, and records. Over 5,000 pages of exhibits, records, and direct, rebuttal, and surrebuttal testimony were filed by the parties. Arkla amended its request to seek a $10.1-million annual increase in rates, Staff recommended a $4.6-million annual increase for Arkla, and the Attorney General argued that Arkla was entitled to a $2.7-million increase. One week before the Commission's hearing on Arkla's application was to begin, the parties began preliminary discussions to determine

whether there was a possibility of narrowing the issues or settling the entire matter. As a result of their discussions, a stipulation was reached among Arkla, Staff, and AGC, that was filed with the Commission on January 23, 1995.

The Stipulation reflected an agreed–upon revenue deficiency that allowed Arkla to increase its rates by $6,976,606.00. The resulting rate increase was allocated among Arkla's customer classes, with $6,860,988.00 (98.3%) of the increase being assigned to the residential class. The Stipulation also provided for the allocation of the revenues lost from the use of the corridor rates. The Stipulation included Arkla's agreement not to file another application requesting a general change in its rates and tariffs prior to June 1, 1996, unless an immediate and impelling necessity existed under the provisions of Ark. Code Ann. § 23-4-408, and Arkla's agreement to dismiss its appeals before the Arkansas Court of Appeals in Case Nos. CA 94-487 and CA 94-731.

Order No. 8, entered by the Commission on March 15, 1995, approved the Stipulation in its entirety. The Attorney General petitioned for rehearing of Order No. 8, and the Commission denied his petition in Order No. 9. On June 13, 1995, the Attorney General filed a notice of appeal from Orders No. 8 and 9.

■■■■ This court's review of the Commission's order is limited and governed by Ark. Code Ann. § 23-2-423(c) (Supp. 1995), which provides in part:

> (3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.

> (4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

It has repeatedly been held that the Commission has wide discretion in choosing its approach to rate regulation and this court does not advise the Commission as to how to make its findings or exercise its discretion. *Bryant v. Arkansas Pub. Serv. Comm'n*, 54 Ark.

App. 157, 168, 924 S.W.2d 472 (1996); *Bryant v. Arkansas Pub. Serv. Comm'n*, 50 Ark. App. 213, 219, 907 S.W.2d 140 (1995). The appellate court is generally not concerned with the method used by the Commission in calculating rates as long as the Commission's action is based on substantial evidence and the total effect of the rate order is not unjust, unreasonable, unlawful, or discriminatory. 50 Ark. App. at 219-20. The appellate court views only the evidence most favorable to the appellees in cases presenting questions of substantial evidence, and the burden is on the appellant to show a lack of substantial evidence to support an administrative agency's decision. *Bryant v. Arkansas Pub. Serv. Comm'n*, 46 Ark. App. 88, 102, 877 S.W.2d 594 (1994). To establish an absence of substantial evidence to support a decision, the appellant must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusion. *AT&T Communications of the SW, Inc. v. Arkansas Pub. Serv. Comm'n*, 40 Ark. App. 126, 131, 843 S.W.2d 855 (1992); *Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 71-72, 813 S.W.2d 263 (1991). The question on review is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made. 35 Ark. App. at 72.

The Attorney General's first point on appeal concerns the Commission's approval of its Stipulation's allocation of the $6.9 million rate increase among the rate classes. The Attorney General does not appeal the overall rate increase, but the Stipulation's apportionment of the rate increase among the various classes of ratepayers. Specifically, he focuses on the Stipulation's provision that allows 98% of the rate increase to be allocated to the residential ratepayers, which he contends is not supported by substantial evidence. In support of his contention, he relies on the cost-of-service studies[1] that his expert witness and Staff prepared in order to determine Arkla's revenue requirement. He argues that these

---

[1] Cost of Service - A term used in public utility regulation to mean the total number of dollars required to supply any total utility service (i.e., revenue requirements); it must include all of the supplier's costs, an amount to cover operation and maintenance expenses, and other necessary costs such as taxes, including income taxes, depreciation, depletion, and amortization of the property not covered by ordinary maintenance.

studies reflect that, at the time of Arkla's rate request, it was earning a positive rate of return on its residential ratepayers and a negative rate of return on its GS-5 and GS-6 ratepayers and that the figures refute Arkla's assertions that the residential ratepayers have been subsidized by the industrial ratepayers.

Staff's cost-of-service study[2], Exhibit DC-2, showed that, based on equal rates of return, Arkla was receiving a 4.69% rate of return from its residential ratepayers compared to a -5.34% rate of return from its GS-5 class. Staff's surrebuttal Exhibit DC-7 cost-of-service study, showed that Arkla received a 3.96% rate of return from its residential class as compared to a -2.59% rate of return from its GS-5 class. The Attorney General's cost-of-service studies demonstrated that rates would need to be increased by 18.07% for the GS-5 class as compared to 1.45% for the residential class to achieve equal rates of return.

■ ■ The Attorney General is correct in his assertion that the individual cost-of-service studies prepared by his expert witness and Staff's witness showed that Arkla was earning a positive rate of return from its residential class and a negative rate of return from some of its industrial classes. These cost-of-service studies, however, were not the only evidence before the Commission, nor did Staff advocate allocating the rate increase based on these studies. Staff's senior gas analyst, Donna Campbell, who prepared

---

Included also is a fair return in order that the utility can maintain its financial integrity, attract new capital, and compensate the owners of the property for the risks involved.

[2] A "cost of service study" is made in order to assist in determining the total revenue requirements to be recovered from each of the various classes of service. The amounts to be recovered from each of the classes of service is determined by the management or a commission after study of the various factors involved in rate design. Cost analysis or cost allocation is an important factor in rate design but only one of several important factors. Cost analysis does not produce a precise inflexible "cost of service" for any individual class of service because cost analysis involves judgment in certain cost areas. Its principal value is in determining the minimum costs attributable to each class of service. Other factors that must be considered in rate design are the value of the service, the cost of competitive services, the volume and load factor of the service and their relation to system load equalization and stabilization of revenue, promotional factors and their relation to the social and economic growth of the service area, political factors such as the sizes of minimum bills, and regulatory factors. American Gas Association, *Glossary for the Gas Industry* 13 (4th ed. 1986).

Staff's cost-of-service studies, testified that she proposed no change in GS-5's and GS-6's revenue requirements because of bypass[3] concerns. This Court recognized in *Bryant v. Arkansas Public Service Commission*, 50 Ark. App. at 237, that a cost-of-service study is merely one tool that may be used in rate-design determinations and noncost factors can also be taken into consideration. *See also Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 20 Ark. App. 216, 222, 727 S.W.2d 146 (1987). The Commission is never compelled to accept the opinion of any witness on any issue before it, nor is it bound to accept one or the other of any conflicting views, opinions, or methodologies. *Bryant v. Arkansas Pub. Serv. Comm'n*, 46 Ark. App. at 103.

We also note that the results of the Attorney General's and Staff's cost-of-service studies were disputed by Arkla and AGC because of their gas main allocations. In preparing its cost-of-service study DC-2, Staff used the zero-intercept method. It used a minimum pipe size of 1.25 inches in preparing DC-7. The Attorney General's cost-of-service studies allocated mains based on the zero-intercept method and the demand method.

In his prefiled testimony, Arkla witness Collier Mickle testified that Arkla's system serves a considerable number of customers in rural areas; that its distribution grid is used far more by the lower-volume customer classes, especially the residential classes, than larger-volume customers; and that, because of the rural nature of Arkansas's system, there is a high ratio of pipe investment per customer, which is rarely found in serving industrial customers. He stated that Arkla takes these factors into consideration by recognizing that the annual throughput has practically nothing to do with the cost of pipe investment. Pipe investment, he explained, is undertaken according to the flow requirements that are expected to be placed upon it at a given location at a given time and, therefore, Arkla's cost-of-service study used pipes that

---

[3] Bypass occurs when large customers arrange direct access to a pipeline supplier; in addition to diminished contribution to fixed costs, bypass can adversely affect remaining customers by reducing the economics of scale achieved by local distribution companies. The bypass of a regulated utility may result in stranded investment, duplicative facilities, and higher rates for remaining customers. *Bryant v. Arkansas Pub. Serv. Comm'n*, 46 Ark. App. at 92, n. 1.

are two inches in diameter as the prevalent minimum size. He stated that, in allocating all costs to customer classes, Arkla used an allocation methodology which yields a result that more closely approximates the actual cost of providing service to an individual customer or group of customers and that Arkla modified the results of its cost-of-service study for purposes of rate design in order to reduce the rate impact on residential customers. He stated that the modification results in greater cost recovery from some nonresidential-customer classes as compared to the results of its cost-of-service study but also represents an additional step toward "true" cost-of-service rates. Mr. Mickle's testimony was corroborated by that of Arkla witness David Sullins, who also noted that Staff's calculation used only plastic pipe, which represents only 31% of the pipe footage in Arkla's system, and that Arkla has a significant investment in steel within its system.

Staff's senior gas analyst, Donna Campbell, argued that performing a zero-intercept analysis of the cost of gas mains was not possible because of data constraints and also recommended use of a minimum-size methodology, although she disagreed with Arkla's use of a two-inch main as the minimum size. She acknowledged that Arkla had indicated that a two-inch main would be installed regardless of the required diameter needed and that virtually all new mains that are designed to directly serve residential or small-business customers are two-inch mains.

Richard Baudino, a utility rate and economic consultant, testified for AGC. He also disagreed with Staff's and the Attorney General's allocation of gas mains, stating that Staff omitted steel mains from its calculation which excludes 69% of the distribution mains and recommended that Arkla's two-inch main be adopted. He also stated that the Attorney General's zero-intercept method was flawed because he used only data for plastic pipe. He stated that allocating gas mains solely on demand skews the results in favor of the residential class and unfairly loads the cost on general service customers.

■ In addressing the allocation of gas mains in *Bryant v. Arkansas Public Service Commission*, 50 Ark. App. at 234, this Court noted that it is an area in which it is appropriate to recognize the

Commission's experience, technical competence, and specialized knowledge, and the discretionary authority conferred upon the Commission. The Public Service Commission has wide discretion in choosing its approach to rate regulation, and it is not bound by a particular method of evaluation. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 267 Ark. 550, 567-68, 593 S.W.2d 434 (1980).

■ The Attorney General also seeks to discredit Arkla's cost-of-service study by arguing that the Attorney General's sales forecast is the only one supported by substantial evidence. We disagree. Sufficient evidence was presented to support Staff's and Arkla's sales forecasts that predicted a downward trend in gas use. Arkla witness Lisa Black testified that, because of improved energy-efficient construction standards, extensive renovation and weatherization of existing homes, and the use of more efficient end-use equipment, conservation is the primary cause of Arkla's declining load. Staff witness Kim Davis also testified that loss of gas-fired air-conditioning customers is a significant factor in the decline of Arkla summer usage and that, at the current rate of decline, Staff projects that no residential gas-fired air-conditioning units will be in service in three to four years.

The Attorney General has not demonstrated that the Commission erred in not adopting his or the Staff's cost-of-service studies, nor has he demonstrated that the rate allocation included in the Stipulation and approved by the Commission is not supported by substantial evidence. He argues that neither Staff nor the Attorney General show in their cost-of-service studies that residential ratepayers should be singled out for the largest rate increase; however, counsel for the Attorney General acknowledged in her opening argument to the Commission that the residential ratepayers did not lose as much in the Stipulation as they would under Arkla's, AGC's, or Staff's testimony. The Commission also had for its consideration over 5,000 pages of prefiled testimony and exhibits, which were admitted into evidence.

Arkla witness David Sullins testified that the allocation of costs among customer classes was an open issue with respect to the Stipulation and that all of the parties except the Attorney General

were able to reach a compromise on that issue. He stated that only the Attorney General recommended rate increases for the larger industrial customers, and in that respect, the Stipulation represents a compromise of the positions of all parties, including the Attorney General. He also stated that the Attorney General suggested further increases for the industrial customers but that such increases were inconsistent with Arkla's cost-of-service study and the recommendations and findings of Staff.

Arkla witness Todd Cooper stated that Arkla's cost-of-service study indicated that its largest gas consumers continue to pay more than their economic cost of service and therefore Arkla proposed to hold constant the distribution rates for GS-2, GS-3, GS-4, GS-5, and GS-6 customers and collect the requested increase from residential and GS-1 customers. He stated that this approach over time will tend to negate the unequal rate of return that currently exists between customer classes without causing rate shock.

Staff witness Donna Gray testified that the evidence in the record and the possibility of rate stability over the next two years were the primary factors that Staff considered in deciding to enter into the Stipulation. She stated that there had been a pattern from the previous rate cases of annual increases of $5 million, that Staff had determined that ratepayers would be faced with at least a $3-million increase over the next two years, and that, in her opinion, the Stipulation provided a more favorable outcome than the ratepayers would have gotten through litigation in another rate case. She stated that the approximate $6.8-million rate increase that will be borne by the residential ratepayers represents a 3.8% increase in their total overall gas bill and will cause an average residential bill to increase $1.46 per month. Ms. Gray further explained that the industrial ratepayers' potential for bypass and its impact on the remaining customers was a major consideration for Staff in developing its ultimate recommendations with regard to cost allocation and rate design.

Richard Baudino, consultant for AGC, stated that, based upon his evaluation of the strengths and weaknesses of the parties' cases, the Stipulation's revenue-increase allocation strikes a balance between the parties' various testimony, the cost-of-service studies

filed, the avoidance of rate shock to any classes, and the risk of litigation.

 The Commission found that the provisions of the Stipulation were clearly within the reasonable range of opinions and recommendations presented by the various expert witnesses and that, based upon their expert testimony, substantial evidence existed to support its conclusion that the Stipulation presented a just and reasonable resolution of the case. We cannot say the Commission's finding in this regard is not supported by substantial evidence.

 It is appropriate for this Court, in reviewing the sufficiency of the evidence to support the rate allocation in the Stipulation, to consider the Stipulation itself, as it is the functional equivalent of testimony in support of it and evidence that the rates included in it are just and reasonable. *See Bryant v. Arkansas Pub. Serv. Comm'n*, 46 Ark. App. at 102-03. The evaluation of testimony in a rate case is for the Public Service Commission, not the courts, and in order to hold the testimony does not constitute substantial evidence, the court must find the testimony has no rational basis. *See Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 267 Ark. at 568.

 We decline to address the Attorney General's argument that the Commission's failure to state in Order No. 8 the proper method for allocating gas mains or the cost-of-service study it used in approving the Stipulation is enough to justify remand. The Attorney General admits in his brief that the Commission does not have to rely entirely on a particular cost-of-service study to decide how rates are allocated per class. Furthermore, the Attorney General did not make such a request in his petition for rehearing. "No objection to any order of the commission shall be considered by the Court of Appeals unless the objection shall have been urged before the commission in the application for rehearing." Ark. Code Ann. § 23-2-423(c)(2) (Supp. 1995).

The Attorney General's second point concerns the Commission's approval of the Stipulation's provision that allows Arkla to collect its corridor rate costs from all ratepayers. Arkla witness

David Sullins explained that corridor rates are rates designed by Arkla to accurately reflect the cost of servicing customers for whom bypass is economically and operationally feasible. The Stipulation includes two corridor rate schedules: the metering and regulating rate schedule (MR-1) and the pipeline corridor rate schedule (PC-1). Customers eligible for MR-1 rates consist of those customers whose delivery point on Arkla's distribution system is within 300 feet of an alternative pipeline or other natural gas source and who can demonstrate that bypass of Arkla's distribution system is economically feasible. Customers eligible for PC-1 rates are those within 2,000 feet. Under the terms of the Stipulation, Arkla is allowed to recover from its remaining ratepayers its corridor rate costs, *i.e.*, the rates it will lose if a ratepayer elects to receive corridor rates, in the following proportions:

| | |
|---|---|
| Residential | 70.6% |
| GS-1 | 10.1% |
| GS-2 | 11.3% |
| GS-3 | 2.7% |
| GS-4 | 1.8% |
| GS-5 | 2.3% |
| GS-6 | 1.2% |
| Total | 100% |

Sullins testified that Arkla had identified thirty-four customers that appear to qualify for the corridor rate schedules and that, if all eligible customers elected to receive corridor rates, the maximum amount of lost rates that would be collected from the remaining ratepayers would be $500,000.

The Attorney General argues that the Stipulation's provision that allows Arkla to recover from its other ratepayers its corridor rate costs violates the "just and reasonable" provisions of Ark. Code Ann. §§ 23-4-103 and 23-4-104 (1987) and is price discrimination, prohibited by Ark. Code Ann. § 23-3-114(a) and (b) (1987).

Arkansas Code Annotated § 23-4-103 (1987) provides:

All rates made, demanded, or received by any public utility, for any product or commodity furnished, or to be furnished, or

any service rendered or to be rendered, and all rules and regulations made by any public utility pertaining thereto shall be just and reasonable, and to the extent that the rates, rules, or regulations may be unjust or unreasonable, are prohibited and declared unlawful.

Arkansas Code Annotated § 23-4-104 (1987) states that all charges, tolls, fares, and rates shall be just and reasonable and that no charge shall be made in any tariffs, rates, fares, tolls, schedules, or classifications except as provided in this act. Arkansas Code Annotated § 23-3-114 (1987) provides:

> (a)(1) As to rates or services, no public utility shall make or grant any unreasonable preference or advantage to any corporation or person or subject any corporation or person to any unreasonable prejudice or disadvantage.
>
> (2) No public utility shall establish or maintain any unreasonable difference as to rates or services, either as between localities or as between classes of service.
>
> (b) The commission, in the exercise of its jurisdiction granted by this act, may fix uniform rates applicable throughout the territory served by any public utility whenever in its judgment public interest requires such uniform rates.

Section 23-3-114 does not prohibit rate differences; it merely prevents *unreasonable* rate differences. *Wilson v. Arkansas Pub. Serv. Comm'n*, 278 Ark. 591, 594, 648 S.W.2d 63 (1983); *Bryant v. Arkansas Pub. Serv. Comm'n*, 50 Ark. App. at 238. Whether a rate difference is unreasonable is a question for the Commission. Ark. Code Ann. § 23-3-114(c). Here, evidence was presented to the Commission from which it could find that corridor rates were a just and reasonable response to the threat of bypass.

Arkla witness David Sullins testified that, in developing corridor rates, Arkla was confronted with bypass of its largest customer, that bypass was economically feasible for that customer, and that several other large customers had indicated that they were in the process of assessing their bypass options. He stated that the corridor rates represent the costs of servicing the customers that qualify for those rates and are necessary to prevent a substantial

number of customers from bypassing Arkla's distribution which would result in an even greater degree of revenue shifting to its remaining customers as a result of bypass.

Staff witness Donna Gray also testified that the corridor rates directly identify a portion of the bypass potential and are a reasonable solution at this time. She stated that a major consideration for Staff in developing its ultimate recommendation with regard to cost allocation was the impact on the remaining ratepayers if industrial ratepayers left the system and their fixed costs were spread among the remaining customers.

AGC witness Richard Baudino recommended approval of the corridor rates, stating that they would allow Arkla to continue to receive fixed cost contribution from the ratepayers who had bypass options and thereby mitigate the loss of revenue that would occur if a customer bypassed the system.

The Commission in Order No. 8 stated that the potential for bypass of Arkla's system was indeed present and that even the Attorney General's witness recognized the existence of this problem. The Commission stated that, although it had some concerns regarding the treatment of the revenues lost to corridor rates, its concerns were not with the availability of the corridor rates as appropriate tools to assist Arkla in controlling bypass. We find that substantial evidence existed for the Commission's approval of corridor rates and the Attorney General has failed to show that the corridor rates are unjust, unreasonable, or discriminatory.

The Attorney General also argues under this point that the Commission erred in not finding that the establishment of the corridor rates constitutes a promotional practice under Section 2 of the Commission's Promotional Practice Rules and Title 23 of the Arkansas Code. We do not address this issue because it was not timely raised. It first appears in the Attorney General's post-hearing brief that was filed after the hearing was concluded. Rule 3.13 of the Commission's Rules of Practice and Procedure provides that "[a] hearing shall be deemed concluded when the presiding officer so determines." The Attorney General has not cited

us to any authority that allows a new issue to be presented after the hearing is concluded.

The Attorney General's final point involves the Stipulation's provision that allows Arkla to collect from its remaining ratepayers the revenue lost as a result of an industrial ratepayer's election to use corridor rates. The Attorney General argues that the allocation of these corridor rate costs to the remaining ratepayers is not based upon substantial evidence. Specifically, he argues that, although neither Arkla nor Staff suggested that residential ratepayers should bear any of the cost of these rates, the Stipulation requires residential ratepayers to bear 70.6% of their cost.

Arkla witness David Sullins testified that it was AGC who recommended that the corridor rate costs be applied to all customer classes, including the residential class. He explained that the Stipulation reflected a compromise of all the parties and that AGC agreed to an increase for its larger customers in return for the agreement to include the residential customers in the allocation. There was also evidence that, even with the additional allocation of corridor rate costs, the residential rate would still be less than the deficiencies for the residential class that were recommended by Staff witness Donna Campbell.

 We recognize that the Stipulation represents a compromise of the parties' positions. To hold that the Commission could not adopt the Stipulation because no party in its prefiled testimony testified in support of the exact same terms as those included in the Stipulation would effectively eliminate the Commission's power to set rates which it finds are just and reasonable. *See Bryant v. Arkansas Public Service Commission*, 46 Ark. App. at 103. It is the total effect of a rate order that we must review, and if the total effect of a rate order cannot be said to be unjust, unreasonable, unlawful, or discriminatory, judicial inquiry is concluded. 46 Ark. App. at 103.

 The Attorney General also refers us to our opinion in *Bryant v. Arkansas Public Service Commission*, 50 Ark. App. at 213, where we stated that the local distribution companies (LDC) such as Arkla also must share some responsibility in balancing the interests between all ratepayers and "[w]here the LDC can be shown

to have lost the contributions of industrial customers through imprudent judgments, LDC shareholders, rather than LDC ratepayers, may be made to bear the consequences of the LDC's inability to handle competition." 50 Ark. App. at 239. Here, however, there is no evidence that Arkla acted imprudently. While we share the Attorney General's concern for the residential ratepayers and continue to urge the Commission to closely scrutinize the allocation of a utility's rate increase, we cannot say, under the facts of this case, that the Commission's approval of the allocation of the corridor rate costs is not supported by substantial evidence.

The Attorney General also stresses that Arkla has no incentive to deny GS-4, GS-5, and GS-6 class applications for corridor rates because Arkla will collect its lost revenues from other ratepayers. The Commission expressed the same concern. To that end, it required Arkla to keep and provide detailed justification records so that the Commission can consider at Arkla's next rate hearing all factors and circumstances bearing on the issue of automatic recovery of lost revenues from Arkla's remaining customers. The Commission took the steps that it deemed necessary to determine whether the allocated revenues should be recovered. We have repeatedly held that the Public Service Commission has wide discretion in choosing its approach to rate regulation, and the appellate court does not advise the Commission on how to make its findings or exercise its discretion. *Bryant v. Arkansas Pub. Serv. Comm'n*, 50 Ark. App. at 219.

Affirmed.

ROBBINS, C.J., and ROGERS and STROUD, JJ., agree.

CRABTREE and ROAF, JJ., concur.

TERRY CRABTREE, Judge, concurring. As the residential consumer assumes proportionately more of the cost of providing services, a public utility's business judgment, bypass options, and cost allocation proposals must be carefully scrutinized to avoid placing the greatest cost burden on the consumers who are least able to afford such costs. This court is mindful that the Commission has broad discretion in exercising its regulatory authority and,

if an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, or discriminatory, then we must affirm that order. *See Bryant v. Arkansas Pub. Serv. Comm'n*, 54 Ark. App. 157, 168, 924 S.W.2d 472, 480 (1996).

The 5,000-page record developed throughout the course of this rate case and the complexity of the issues effectively prevent any simple discussion of the allocation of rates among the utility ratepayers. The majority concludes that this settlement is a compromise agreement of the interested parties and is adequately grounded in substantial evidence to preclude this court's intervention. Based on this court's deference to the expertise of the Commission and our limited review, I agree, but I suspect that this case pushes the bounds of what can possibly survive review as "reasonable" without reducing our standard of review to a mere formality. The bottom line is that this court has found that an allocation of 98.3% of a rate increase for the residential class is not unjust, unreasonable, unlawful, or discriminatory. What then could possibly amount to an unreasonable allocation for future rate increases?

The evidence presented to the Commission shows that the bypass problem is not likely to go away or be easily addressed. In fact, in its decision, the Commission acknowledged its concern about this issue and the problems it will continue to present in the near future. Under our appellate standard of review, solutions to this problem cannot come from this court. I therefore write this concurrence to stress that solutions to this problem must be addressed by the utilities, the Public Service Commission Staff, the Commission, and all other interested parties, including the Attorney General.

ROAF, J., joins.