ARKANSAS GAS CONSUMERS, INC. *v.*
ARKANSAS PUBLIC SERVICE COMMISSION

CA 02-51 91 S.W.3d 75

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered November 20, 2002

[Petition for rehearing denied January 8, 2003.*]

---

\* HART, J., would grant.

4

6

*Rose Law Firm, a Professional Association,* by: *Stephen N. Joiner,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Eric B. Estes,* Ass't Att'y Gen., for appellee.

*Charles J. Harder,* for Reliant Energy Arkla.

*Jeffrey L. Dangeau,* for Arkansas Western Gas Company.

JOHN F. STROUD, JR., Chief Judge. This appeal from the Arkansas Public Service Commission involves the Commission's approval of a Temporary Low Income Customer Gas Reconnection Policy ("Policy"). During the winter of 2000-01, the weather was extremely cold, which caused a higher-than-normal use of natural gas; at the same time, natural gas commodity

prices were unusually high. These conditions combined to create extraordinarily high natural gas bills, and as a result, many customers had difficulty paying their bills. Consequently, natural gas service to over 30,000 residential customers was disconnected for nonpayment. The reconnect provisions in the Commission's regulations and in the companies' tariffs required the payment of a reconnect fee and a security deposit and acceptable arrangements for the payment of the past-due bill prior to restoration of service. In October 2001, approximately 29,500 of these customers remained disconnected.

Recognizing the existence of a public health emergency, the Commission established Docket No. 01-248-U, and in Order No. 1 proposed a remedial policy, established a schedule for comments, and set a date for a public hearing. In Order No. 1, the Commission found that the public interest required it to expeditiously consider an extraordinary assistance program designed to help low-income families in Arkansas obtain reconnection of their natural gas service before the onset of cold winter weather. The proposed policy covered those customers disconnected between January 1, 2001, and November 1, 2001. The Consumer Utilities Rate Advocacy Division of the Arkansas Attorney General's Office (AG), appellant Arkansas Gas Consumers, Inc., Reliant Energy Arkla (Arkla), Arkansas Western Gas Company (AWG), Arkansas Oklahoma Gas Corporation (AOG), and the Commission's Staff were made parties to this proceeding. The parties filed initial and reply comments on the proposed policy.

Members of the public presented testimony about the existence of the natural gas emergency and the need for a remedy at the public hearing on November 9, 2001. That day, the Commission issued Order No. 2, which implemented the Policy. It stated:

> Many of these disconnected homes are occupied by low income families that are simply unable financially to raise the necessary dollars to have their disconnected gas service restored. Recognizing that another winter season is about to begin and also in anticipation of another winter of high natural gas costs, the Commission proposed the implementation of the TLICGRP. Without assistance, many of these low-income families will be

facing winter without heat for their homes. Without heat, the health, lives and safety of these families will be threatened. Accordingly, the Commission determined that the public interest required the expeditious consideration and implementation of an appropriate low-income family gas reconnection policy.

The Policy temporarily waived the inconsistent reconnect provisions of the Commission's regulations and of the natural gas companies' tariffs. The Policy provided that customers whose household income did not exceed 200% of the federal poverty guidelines, and whose service was disconnected between January 1, 2001, and November 1, 2001, and who remained disconnected as of November 9, 2001, could have service reconnected if they (1) entered into a delayed payment agreement (DPA), which provided that the customer pay off his past-due amount by paying a small amount each month for a maximum of thirty-six months; (2) pay the utility's reconnection charge in full; and (3) agree to participate in the utility's levelized or average payment program, for at least as long as the term of the DPA, to enable the customer to stay current on his future bills. A final enrollment date of December 31, 2001, was established. Order No. 2 also provided that, in return for reconnecting customers under these conditions, the utilities were permitted to recover, over a period of twelve months and through their purchased gas adjustment (PGA), gas supply rate (GSR), or bill line item adjustment, the total bad debt attributable to customers enrolled in the Policy.[1] Order No. 2 further provided that the participating customers would not be forgiven for any portion of their arrearages and would remain liable to the utility for the full amount of their past-due balances. As they made payments pursuant to the Policy, those payments would be credited to the PGA, GSR, or bill line item adjustment. Also, if a customer defaulted on a payment under the DPA, he would lose the benefits of the Policy, would suffer disconnection of service, and would be subject to all of the normal collection policies.

---

[1] Eligible debits would include not only existing past-due amounts but also new unpaid debt incurred between January 1, 2001, and April 30, 2002, while the customer was a participant in the program.

On November 13, 2001, appellant filed a petition for rehearing. On November 14, 2001, the Commission issued Order No. 3, which was entitled "Errata Order." That order stated:

> The first full sentence of Amendment 1, which begins at the bottom of page 3 and continues at the top of page 4 of Order No. 2 issued on November 9, 2001, is amended to read as follows:
>
> > 1. Eligibility for the TLICGRP is expanded to cover those low income customers who were disconnected from gas service for non-payment between January 1, 2001, and December 31, 2001, and who remain disconnected as of the date of this order or who are scheduled to be disconnected for nonpayment on or before December 31, 2001, and whose total family income does not exceed 200 percent of the currently approved Federal Poverty Guidelines.

On November 19, 2001, the Commission entered Order No. 4, wherein it stated:

> Order No. 2 of this docket, issued November 9, 2001, established and implemented the Temporary Low Income Customer Gas Reconnection Policy ("TLICGRP"). Errata Order No. 3, issued November 14, 2001, amended the first full sentence of Amendment 1 to the TLICGRP as adopted by Order No. 2. On November 15, 2001, Arkansas Oklahoma Gas Corporation ("AOG") filed a letter request for clarification of Errata Order No. 3. By this order the Commission will address AOG's request for clarification.
>
> By Order No. 2, as amended by Errata Order No. 3, it was and remains the Commission's intent to provide a 'program' that will enable low income residential customers disconnected from the natural gas utility system to be reconnected before the onset of cold weather. The TLICGRP is intended to assist certain low income customers who are either currently disconnected or are scheduled to be disconnected by December 31, 2001, due to their default on payment for gas usage during the winter heating season of 2000-2001.

On December 12, 2001, appellant filed another petition for rehearing asking the Commission to reconsider Order Nos. 3 and 4. On December 13, 2001, in Order No. 5, the Commission

consolidated appellant's two petitions for rehearing. On January 9, 2002, in Order No. 6, the Commission denied both petitions.

Appellant argues on appeal that the Commission exceeded its authority or, in the alternative, abused its discretion in issuing the Policy, that the Policy is not supported by substantial evidence, and that the ratepayers were denied due process.

*Mootness*

As a preliminary matter, we must address the AG's argument that this case is now moot because the Policy has already been implemented. It is true that we do not ordinarily decide moot issues. However, there is an exception to the mootness doctrine for cases that are capable of repetition yet evade review. *Paslay v. Arkansas Dep't of Human Servs.*, 75 Ark. App. 19, 53 S.W.3d 67 (2001). Also, when a case involves the public interest, or tends to become moot before litigation can run its course, we have, with regularity, refused to let mootness become the determinant. *Id.; Bryant v. Arkansas Pub. Serv. Comm'n*, 45 Ark. App. 56, 871 S.W.2d 414 (1994). Because this case involves the public interest and it is possible that this situation may arise again, we will address the merits of appellant's argument.

*Standard of Review*

Arkansas Code Annotated section 23-2-423(c)(4) (Repl. 2002) limits our review of appeals from the Commission; we are to determine only whether the Commission's findings of fact are supported by substantial evidence, whether the Commission has regularly pursued its authority, and whether the order under review violated any right of the appellant under the laws or the constitutions of the State of Arkansas or the United States. *Brandon v. Arkansas W. Gas Co.*, 76 Ark. App. 201, 61 S.W.3d 193 (2001). If an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, nor discriminatory, then this court must affirm the Commission's action. *Id.* Nevertheless, it is clearly for the courts to decide the questions of law involved and to direct the Commis-

sion where it has not pursued its authority in compliance with the statutes governing it or with the state and federal constitutions. *Id.*

 The Commission has broad discretion in exercising its regulatory authority, and courts may not pass upon the wisdom of the Commission's actions or say whether the Commission has appropriately exercised its discretion. *Consumer Util. Rate Advocacy Div. of the Ark. Attorney General's Office v. Arkansas Pub. Serv. Comm'n,* 76 Ark. App. 557, 69 S.W.3d 896 (2002); *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n,* 69 Ark. App. 323, 13 S.W.3d 197 (2000). Administrative action may be regarded as arbitrary and capricious only when it is not supportable on any rational basis, and something more than mere error is necessary to meet the test. *Id.* To set aside the Commission's action as arbitrary and capricious, the appellant must prove that the action was willful and unreasonable, made without consideration and with a disregard of the facts or circumstances of the case. *Id.*

## Jurisdiction of the Commission

Of primary concern in this case is the jurisdiction of the Commission, as delegated by the legislature. Appellant contends that the Commission has no authority to provide assistance to low-income families, using ratepayers as the source and public utilities as the conduit, for such assistance. Appellant urges us to hold that this is a matter of public policy that can be addressed only by the General Assembly.

██ ██ In our view, however, the legislature has already delegated this matter to the Commission. The Commission was created to act for the General Assembly. *Bryant v. Arkansas Pub. Serv. Comm'n,* 46 Ark. App. 88, 877 S.W.2d 594 (1994). As a creature of the legislature, it performs, by delegation, legislative functions. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n, supra.* As such, the Commission possesses the same powers as the General Assembly while acting within its legislatively delegated powers and has very broad discretion in exercising those powers. *Id.* It is true that, although the Commission is vested with broad authority, it does not have the power to deal exclusively with *all* matters involving utilities; its jurisdiction extends

only to those activities in which the utilities are acting as public utilities. *See Ozarks Elec. Coop. Corp. v. Turner,* 277 Ark. 209, 640 S.W.2d 438 (1982).

In enacting Ark. Code Ann. § 23-2-304 (Repl. 2002), the legislature set forth the following powers of the Commission:

> (a) The commission, upon complaint or upon its own motion and upon reasonable notice and after a hearing, shall have the power to:
>
> (1) Find and fix just, reasonable, and sufficient rates to be thereafter observed, enforced, and demanded by any public utility;
>
> (2) Determine the reasonable, safe, adequate, and sufficient service to be observed, furnished, enforced, or employed by any public utility and to fix this service by its order, rule, or regulation;
>
> (3) Ascertain and fix adequate and reasonable standards, classifications, regulations, practices, and services to be furnished, imposed, observed, and followed by any or all public utilities . . . .

These enumerated powers, however, are not the full extent of the Commission's authority. The General Assembly has chosen not to limit the Commission's jurisdiction to the powers expressly set out in the public utility statutes. *Brandon v. Arkansas Pub. Serv. Comm'n,* 67 Ark. App. 140, 992 S.W.2d 834 (1999). In Ark. Code Ann. § 23-2-301 (Repl. 2002), the legislature broadly defined the Commission's authority as follows:

> The commission is vested with the power and jurisdiction, and it is made its duty, to supervise and regulate every public utility defined in § 23-1-101 and to do all things, whether specifically designated in this act, that may be necessary or expedient in the exercise of such power and jurisdiction, or in the discharge of its duty.

Therefore, in order to address the issue of the Commission's jurisdiction, we must construe these statutes. The basic rule of statutory construction is to give effect to the intent of the legislature. *Southwestern Bell Mobile Sys., Inc. v. Arkansas Pub. Serv. Comm'n,* 73 Ark. App. 222, 40 S.W.3d 838 (2001). When the language of a statute is plain and unambiguous, legislative

intent is determined from the ordinary meaning of the language used. *Id.* All statutes relating to the same subject matter must be construed together. *Doe v. Baum*, 348 Ark. 259, 72 S.W.3d 476 (2002). Unambiguous statutes are construed by looking to all laws on the subject, viewing them as a single system, and giving effect to the general purpose of the system. *Arkansas County v. Desha County*, 342 Ark. 135, 27 S.W.3d 379 (2000). The interpretation of a statute is a judicial function, and the Commission's construction is not binding on the court. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n, supra.* Nevertheless, the interpretation given a statute by the agency charged with its execution is highly persuasive, and while not conclusive, it should not be overturned unless it is clearly wrong. *Id. Accord AT&T Communications of the S.W., Inc. v. Arkansas Pub. Serv. Comm'n,* 344 Ark. 188, 40 S.W.3d 273 (2001). We believe that the Commission is correct in construing these statutes as giving it broad jurisdiction over matters involving public utilities, including those concerning public health and safety.

In support of its argument, appellant quotes the following language of the Commission from a 1998 draft report regarding the restructuring of Arkansas's electric utility industry:

> Utility services have long been recognized as vital to health, safety, and comfort in today's society, and the Commission is mindful of the hardships that may be imposed on the economically disadvantaged by unnecessarily high utility bills. Assistance in paying those bills or in reducing them through weatherization measures could provide those benefits to low-income families. Nevertheless, whether utilities should provide those benefits or whether they should come from direct tax revenues is a question of state and federal legislation. If it is determined that low-income assistance and weatherization funds should be provided through utility rates, then collection of the subsidies should be done on a competitively neutral fashion.
>
> The Commission will design a competitively neutral way to charge for low-income and weatherization programs, if the General Assembly determines that it is desirable.

*In re Implementation of a Competitive Retail Elec. Market — Gen. Principles,* APSC Docket No. 97-452-U, Order No. 18 at 75-76 (August 28, 1998).

This quote, however, does not apply to the present case, because the circumstances leading up to its issuance were entirely different from the situation preceding the implementation of the Policy at issue. The Commission's 1998 draft report was the result of certain generic proceedings initiated by the Commission to address the changes necessary to accommodate the transition from a monopoly environment to a competitive retail electricity market in Arkansas. In one of those proceedings, Docket No. 97-452-U, one of the parties supported a low-income assistance program funded by a competitively neutral surcharge. Also, the AG recommended that utilities and non-utility electric service providers be required to offer assistance to low-income customers through lifeline rates, low-income discounts, deferred billing, and deferred payment plans, to be funded by a .012 percent gross revenue charge. The consensus of a broad spectrum of Arkansas interests in and affected by the electric utility industry, however, recommended that assistance for low-income customers be provided by government agencies rather than be mandated for utilities. As the Commission explained in the above quote, it agreed that these matters should first be addressed by the General Assembly.

The situation before us is easily distinguishable from Docket No. 97-452-U, in which, unlike the present case, no public health and safety emergency required the Commission's immediate attention. Additionally, the surcharge proposed in Docket No. 97-452-U was not temporary in nature but of unlimited duration, in contrast to the short-term surcharge imposed by the Policy in dispute here. We believe that the Commission's statements in Docket No. 97-452-U have no application to this case.

Although appellant characterizes the Policy as nothing more than assistance to low-income customers, it must also be regarded as an exercise of the Commission's legislatively delegated authority to regulate public utilities, to fix reasonable and sufficient rates, and to determine the reasonable, safe, adequate, and sufficient service to be furnished by the natural gas utilities. *See* Ark. Code Ann. § 23-2-304(a)(1) and (2). The stated purpose of the Policy was to address an undisputed public health and safety emergency, and its intended effect was to enable residential gas customers to heat their homes during the 2001-02 winter. Fur-

ther, the Policy dealt with activities in which the natural gas companies act as public utilities — the reconnection of gas service to customers and the recovery by the utilities of the costs of providing natural gas utility service. Our construction of the statutes by which the legislature established the Commission's jurisdiction convinces us that the Commission had jurisdiction to protect the public interest in this manner and that it did not exceed its authority in implementing the Policy.

## The Surcharge

As part of its jurisdictional argument, appellant also contends that the Commission exceeded its powers in implementing the method by which the costs of the Policy would be recovered, a temporary surcharge. According to appellant, the Commission has no legal authority to utilize a surcharge in this situation.

Act 310 of 1981, codified at Ark. Code Ann. §§ 23-4-501 through 23-4-509 (Repl. 2002), provides for a surcharge in certain instances. Arkansas Code Annotated section 23-4-502 provides for the implementation of a temporary surcharge under the following conditions:

> Any public utility as defined in § 23-1-101 may recover all costs and expenses reasonably incurred by such a utility as a direct result of legislative or regulatory requirements relating to the protection of the public health, safety, and the environment by filing with the Arkansas Public Service Commission, no more frequently than once every six (6) months, an interim rate schedule which would impose a separate surcharge in addition to its currently effective rates until the implementation of new rate schedules in connection with the next general rate filing of the utility wherein such additional expenditures can be included in the utility's base rate schedules.

Appellant argues that the Policy at issue, implemented by the Commission through its orders, is not the sort of "regulatory requirement" contemplated by Ark. Code Ann. § 23-4-502. Instead, appellant contends, the temporary surcharge authorized by the Act must be for new equipment or expenses that are imposed by governmental requirements adopted between utility rate cases. Act 310 's emergency clause stated:

Existing statutes of this State do not provide for a procedure to permit immediate recovery of additional expenditures with respect to existing utility facilities incurred by public utilities as a result of legislative or regulatory requirements without the filing of a general rate case with the Public Service Commission. These circumstances result in a gross inequity in that utilities must make expenditures to provide facilities which are clearly in the public interest which costs cannot be recovered in a prompt and timely manner by the utility. Therefore, an emergency is declared to exist, and this Act being necessary for the immediate preservation of the public peace, health and safety shall be in effect from and after its passage and approval.

The policy behind Act 310 is also expressed in Ark. Code Ann. § 23-4-501 as follows:

(a) It is recognized that legislative or administrative regulations impose certain legal requirements upon public utilities relating to the protection of the public health, safety, or the environment, and that:

(1) In order to comply with such legislative or regulatory requirements, utilities are required to make substantial additional investments or incur additional expenses with respect to existing facilities used and useful in providing service to the utility's customers; and

(2) Although such additional investments and expenses are necessary in order to provide service to the utility's customers, such additional investments and expenses are not included in the utility's rates and cannot be recovered in a prompt and timely fashion under existing regulatory procedures.

(b) It is intended by the General Assembly that utilities be permitted to recover in a prompt and timely manner all such costs incurred by utilities in order to comply with such legislative or regulatory requirements through an interim surcharge which, if approved, shall be effective until the implementation of new rate schedules in connection with the next general rate filing of the utility wherein such additional investments or expenses can be included in the utility's base rate schedules. However, the costs to be recovered through such an interim surcharge shall not include increases in the cost for employment compensation or benefits as a result of legislative or regulatory action.

In *Arkansas Oklahoma Gas Corporation v. Arkansas Public Service Commission*, 301 Ark. 259, 783 S.W.2d 350 (1990), this statutory subchapter was held to provide for the recovery of the costs associated with the removal of asbestos, as required by federal regulations. The court held that the regulatory requirements related to the protection of public health, safety, and the environment.

■ ■ We do not construe Act 310 as narrowly as does appellant. We will not interpret a statute so strictly as to reach a conclusion that is contrary to legislative intent. *AT&T Communications of the S.W., Inc. v. Arkansas Pub. Serv. Comm'n, supra; Brandon v. Arkansas Pub. Serv. Comm'n*, 67 Ark. App. 140, 992 S.W.2d 834 (1999). The legislature has made it clear that we should broadly construe the Commission's authority to regulate public utilities and to protect the public health and safety. Therefore, construing Act 310 broadly, as we must, we hold that the interim surcharge imposed by the Policy is authorized by Ark. Code Ann. § 23-4-502 because it serves to recoup the costs associated with a regulatory requirement relating to the protection of the public health and safety. Even though this requirement was imposed on the utilities by order and not by rule or regulation, it was implemented by the administrative agency to which the legislature has delegated the regulation of public utilities. In our view, the Policy is no less a "regulatory requirement" than those promulgated by rule or regulation by other governmental entities.

■ In another context, rate regulation, we have said many times that the Commission has wide discretion in choosing its approach and that we do not advise the Commission concerning how to make its findings or exercise its discretion. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 58 Ark. App. 145, 946 S.W.2d 730 (1997). The Commission is free, within the confines of its statutory authority, to make the pragmatic adjustments that may be called for by particular circumstances. *Bryant v. Arkansas Pub. Serv. Comm'n*, 54 Ark. App. 157, 924 S.W.2d 472 (1996). We are generally not concerned with the method used by the Commission in calculating rates so long as the Commission's action is based on substantial evidence. *Id.* We have often said that it is the result reached, and not the method used, that primarily controls. *See id.* Additionally, we have frequently stated that

judicial inquiry terminates if the Commission's decision is supported by substantial evidence and the total effect of the order is not unjust, unreasonable, unlawful, or discriminatory. *See id. Accord Bryant v. Arkansas Pub. Serv. Comm'n,* 50 Ark. App. 213, 907 S.W.2d 140 (1995). The same principles should apply in this case.

 ██ Additionally, we believe that, even if there were no section 23-4-502, the Commission has, within its broad authority, the power to create and implement methods for recouping the costs of remedial policies such as this. As discussed above, the legislature has expressly given the Commission authority to regulate public utilities, to fix reasonable and sufficient rates, and to determine the reasonable, safe, adequate, and sufficient service to be furnished by the gas utilities. *See* Ark. Code Ann. § 23-2-304. The legislature has explicitly given the Commission the power to do "all things, whether specifically designated in this act, that may be necessary or expedient in the exercise of such power and jurisdiction . . . ." Ark. Code Ann. § 23-2-301. In exercising this power, the Commission is acting for the General Assembly and has the same powers that body would have. Using its expertise in such matters, the Commission created the surcharge and limited its duration to a twelve-month period. In our view, the temporary surcharge was a necessary and expedient method by which to recoup the costs associated with the implementation of a policy that was squarely within the Commission's jurisdiction to impose.

### Illegal Exaction

Pointing out that the Commission has no taxing authority, *see* Arkansas Const. art. II, § 23, appellant also argues that the Policy is an illegal exaction, *i.e.,* a tax that is not authorized by law. None of the cases cited by appellant, however, stand for the proposition that the temporary surcharge at issue is a tax. We therefore reject this argument.

## Rate Differences

In its second point on appeal, appellant argues that the Policy has no relationship to the cost of service and, therefore, discriminates among similarly-situated ratepayers in violation of Ark. Code Ann. § 23-3-114 (Repl. 2002).[2] This statute provides:

> (a)(1) As to rates or services, no public utility shall make or grant any unreasonable preference or advantage to any corporation or person or subject any corporation or person to any unreasonable prejudice or disadvantage.
>
> (2) No public utility shall establish or maintain any unreasonable difference as to rates or services, either as between localities or as between classes of service.
>
> (b) The commission, in the exercise of its jurisdiction granted by this act, may fix uniform rates applicable throughout the territory served by any public utility whenever in its judgment public interest requires such uniform rates.
>
> (c) The commission may determine any question or fact arising under this section.

The statute, however, does not prohibit rate differences; it merely prevents unreasonable rate differences. In *Bryant v. Arkansas Public Service Commission*, 57 Ark. App. 73, 941 S.W.2d 452 (1997), we affirmed the Commission's order approving a stipulation allowing a natural gas distribution company to raise rates and to allocate 98% of the rate increase to residential ratepayers. We found that substantial evidence supported the Commission's approval of corridor rates for customers for whom bypass to an alternative natural gas source was economically feasible. The result in that case was that other customers paid the rates lost due to some customers' election to receive corridor rates.[3]

Additionally, we have recognized that a cost-of-service study is merely one tool that may be used in rate-design

---

[2] Appellant also relies on *Acme Brick Co. v. Arkansas Public Service Commission*, 227 Ark. 436, 299 S.W.2d 208 (1957). In our view, *Acme Brick* is irrelevant in the context of this case. In *Acme Brick*, the court compared the rate-base method to the fair field method in determining the net profits that a utility can earn; it did not address the issues presented in this case.

[3] Appellant was a party to that stipulation.

determinations; that noncost factors can also be taken into consideration; and that a ratemaking agency can establish different rates for different classes of customers. In *Bryant v. Arkansas Public Service Commission*, 50 Ark. App. 213, 238, 907 S.W.2d 140, 154 (1995), we affirmed the Commission's decision in which the Commission had balanced both cost and noncost factors and had made choices among public-policy alternatives. "Different rates are certainly related to the cost of service but, . . . that concept involves a 'myriad of facts' and other considerations are also proper." *Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 20 Ark. App. 216, 224, 727 S.W.2d 146, 151 (1987).

■■ ■■ Generally, what is reasonable is a question of fact. *See Salem v. Lane Processing Trust*, 72 Ark. App. 340, 37 S.W.3d 664 (2001). In light of the undisputed public-health-and-safety emergency that prompted the Commission's decision, the Policy's temporary advantage to a class of low-income customers was reasonable under the circumstances.

### Single-Issue Ratemaking

Calling the Policy a "general rate increase that must be addressed in a general rate case," appellant contends in its third point that the Policy constitutes unlawful single-issue ratemaking that violates Ark. Code Ann. § 23-4-406 (Repl. 2002). Arkansas Code Annotated section 23-4-406 sets forth the implementation of rate increases within the context of a general rate case as follows:

> For the purpose of justifying the reasonableness of a proposed new rate schedule, a utility may utilize either a historical test period of twelve (12) consecutive calendar months or a forward-looking test period of twelve (12) consecutive calendar months consisting of six (6) months of actual historical data derived from the books and records of the utility and six (6) months of projected data which together shall be the period or test year upon which fair and reasonable rates shall be determined by the Arkansas Public Service Commission. However, the commission shall also permit adjustments to any test year so utilized to reflect the effects on an annualized basis of any and all changes in circumstances which may occur within twelve (12) months after

the end of the test year where such changes are both reasonably known and measurable.

Appellant argues that, because the statute requires examination of all of a utility's expenses and revenues, the Commission cannot grant a rate increase for "one isolated expense" and abandon the traditional rate-of-return method of setting utility rates. However, the statutes dealing with general rate increases come into effect when a *public utility* requests a change in its rates or charges. *See* Ark. Code Ann. § 23-4-401(a) (Repl. 2002). Here, the surcharge imposed by the Policy was not requested by the utilities.

Additionally, the topic of single-issue ratemaking has rarely been addressed in cases appealed from the Arkansas Public Service Commission. *See Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 58 Ark. App. 145, 946 S.W.2d 730 (1997). However, it has been held in other states that the rule against single-issue ratemaking applies only to the treatment of one expense item in the context of a general rate case, not when a surcharge is expressly provided for by statute. *See Pennsylvania Indus. Energy Coalition v. Pennsylvania Pub. Util. Comm'n*, 653 A.2d 1336 (Pa. Commw. Ct. 1995), *aff'd*, 543 Pa. 307, 670 A.2d 1152 (1996). This principle was expressed in *Citizens Utility Board v. Illinois Commerce Commission*, 166 Ill.2d 111, 137-38, 651 N.E.2d 1089, 1102 (1995):

> The utilities argue that the principles set forth in *Business & Professional People* regarding single-issue ratemaking do not apply except in the context of a complete base rate proceeding. We agree. In the present case, we are not faced with the Commission's treating a single-expense item within the context of a general rate case. In contrast, a rider mechanism merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return. The prohibition against single-issue ratemaking requires that, in a general base rate proceeding, the Commission must examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement, including its return on investment. The rule does not circumscribe the Commission's ability to approve direct recovery of unique costs through a rider when circumstances warrant such treatment.

■ Appellant further contends that this Policy is ill-advised as a matter of public interest. We disagree. As we explained above, the Commission implemented the Policy, which is temporary in duration, to address an emergency that threatened the health and safety of thousands of natural gas customers in Arkansas. In light of the Commission's broad discretion in exercising its regulatory authority, we cannot say that its decision to implement the Policy to meet this emergency was arbitrary, capricious, or against public policy.

*Cost Recovery*

In its fourth point on appeal, appellant argues that the Policy improperly guarantees the utilities' recovery of a portion of their bad debt and points out that utilities have no guaranteed level of earnings from their operations. This appears, however, to be a reargument of appellant's contention that the Commission is not free to abandon the traditional rate-of-return method for setting rates. For the same reasons we expressed above, we also reject this argument.

*Double Recovery*

Citing Ark. Code Ann. § 23-4-103 (Repl. 2002), which requires that utility rates be just and reasonable, appellant notes in its fifth point that the utilities' existing base rates already include an amount for bad debt and asserts that the utilities will recover their bad-debt expense twice.

■ We disagree. The Policy does not cover all of the bad debt attributable to all customers, but only to those customers who enroll in the Policy. Also, the surcharge at issue is of limited duration. Further, Robert Booth, the manager of the Commission's gas and water utilities section, testified that it seemed unlikely that double recovery would occur.

## Sufficiency of the Evidence

■■■■ Appellant contends in its sixth point on appeal that, even if the Commission had authority to implement the Policy, its decision is not supported by substantial evidence. In order to prove that a Commission decision is not supported by substantial evidence, the appellant must show that the proof before the Commission was so nearly undisputed that fair-minded persons could not reach the conclusion the Commission did. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 68 Ark. App. 148, 5 S.W.3d 484 (1999). Evaluation of testimony is for the Commission, not the courts; to hold that testimony does not constitute substantial evidence, we must find that the testimony has no rational basis. *Bryant v. Arkansas Pub. Serv. Comm'n*, 57 Ark. App. 73, 941 S.W.2d 452 (1997). We view only the evidence that is most favorable to the appellee in cases presenting questions of substantial evidence. *Id.* For purposes of determining whether an administrative agency's decision is supported by substantial evidence, the question on review is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made. *Id.*

■■■■ Appellant argues that there was no evidence that customers who could not pay their bills for the winter of 2000-01 would be able to pay them during the winter of 2001-02. Appellants are incorrect. At the public hearing, several witnesses[4] testified that eligible customers would probably be able to make the payments called for by the Policy. Also, the record contains written documentation of the financial obstacle created by the standard up-front reconnection costs. Further, the parties' pre-filed comments generally agreed on the need for the Commission to address this problem. In any event, the Commission did not issue the Policy for the purpose of decreasing the utilities' outstanding bad debt but to protect the health and safety of thousands of natural gas customers affected by an unprecedented emergency, the existence

---

[4] Reverend Dalton Jones, Jonetta Davis, Janet Miles, Tasha O'Neil, and Jody Love were the witnesses who testified at the hearing.

of which appellant does not dispute. The Commission's decision is supported by substantial evidence.

*Order Nos. 3 and 4*

Appellant contends in its sixth and seventh points that Order Nos. 3 and 4 should be reversed because they are not supported by any evidence and do not contain additional findings.[5] As it had proposed in Order No. 1, the Commission issued its Policy in Order No. 2, covering customers whose natural gas service had been disconnected for nonpayment between January 1, 2001, and November 1, 2001. Order No. 3 extended the eligibility date to cover customers whose service was disconnected on or before December 31, 2001. In Order No. 4, the Commission responded to a request for clarification of Order No. 3, stating that the Policy applied to customers who were then disconnected or who would subsequently be disconnected prior to December 31, 2001, for default in payment for their gas usage during the 2000-01 winter heating season.

▮ Arkansas Code Annotated section 23-2-421(a) (Repl. 2002) requires that the Commission's decision be in sufficient detail to enable any court in which the action of the Commission is involved to determine the controverted question presented by the proceeding. *Alltel Ark., Inc. v. Arkansas Pub. Serv. Comm'n*, 70 Ark. App. 42, 19 S.W.3d 634 (2000). However, it is not required that the Commission make findings of fact upon all items of evidence or issues, nor even necessarily to answer each and every contention raised by the parties; the findings should be sufficient to resolve material issues, or those raised by the evidence that are relevant to the decision. *Bryant v. Arkansas Pub. Serv. Comm'n*, 54 Ark. App. 157, 924 S.W.2d 472 (1996).

▮ We hold that additional findings were not necessary and that the evidence that supports Order No. 2 equally supports

---

[5] Appellant also asserts that the Commission abused its discretion in Order Nos. 3 and 4 because those orders gave customers an incentive to default on their obligations. Appellant, however, has offered nothing to substantiate this claim.

Order Nos. 3 and 4. In Order No. 3, entitled "Errata Order," the Commission indicated that it was correcting Order No. 2 to reflect what the Commission had originally intended — that the eligibility period would coincide with the enrollment period. In Order No. 4, the Commission clarified Order No. 3, stating that qualifying customers' debts must be for gas usage during the previous year's winter heating season. Thus, Order Nos. 3 and 4 simply corrected and clarified Order No. 2, which was issued after public notice, comment, and a hearing. There was no question that the purpose of the Policy implemented in Order No. 2 was to address the emergency created by the unusual conditions of the winter of 2000-01 and the thousands of customers who remained, at the start of the next winter, unable to pay their bills for the winter of 2000-01.

*Due Process*

In its eighth and final point on appeal, appellant faults the Commission's failure to give notice to, and invite comment by, the public and the parties before entering Order Nos. 3 and 4. Appellant argues that the extension of the eligibility cut-off date from November 1, 2001, to December 31, 2001, set forth in Order No. 3, and clarified in Order No. 4, violated ratepayers' due process rights. Appellant concedes, however, that due process was afforded with respect to Order No. 2.

A fundamental requirement of due process in matters of public utility regulation is a full and fair hearing, and a basic element of a full and fair hearing is that all those whose rights are involved have the opportunity to be heard, to submit evidence and testimony, to examine witnesses, and to present evidence or testimony in rebuttal to adverse positions. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 58 Ark. App. 145, 946 S.W.2d 730 (1997); *Bryant v. Arkansas Pub. Serv. Comm'n*, 46 Ark. App. 88, 877 S.W.2d 594 (1994). Appellant, in attacking the procedure before the Commission as a denial of due process, has the burden of proving its invalidity. *Id.* The concept of due process requires neither an inflexible procedure universally applicable to every situ-

ation nor a technical concept with a fixed content unrelated to time, place, and circumstance. *State of Washington v. Thompson*, 339 Ark. 417, 6 S.W.3d 82 (1999). Instead, what process must be afforded is determined by context, dependent upon the nature of the matter or interest involved. *Id.* The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.*

■ Under the circumstances, appellant and the ratepayers received all of the process they were due. The question of customer eligibility for the Policy, which was designed to address the emergency created the previous winter, was wholly within the scope of the proceedings held prior to the entry of Order No. 2. That order was simply corrected and clarified by Order Nos. 3 and 4.

■ Also, appellant has failed to demonstrate *how* the change in eligibility date made in Order Nos. 3 and 4 will adversely affect the ratepayers. Error unaccompanied by prejudice, commonly called harmless error, is not ground for reversal. *McCoy Farms, Inc. v. J&M McKee*, 263 Ark. 20, 563 S.W.2d 409 (1978), *cert. denied*, 439 U.S. 862 (1978). The harmless-error rule applies even when the error is of constitutional proportions. *Id.*

Affirmed.

ROBBINS, VAUGHT, and BAKER, JJ., agree.

HART and ROAF, JJ., dissent.

JOSEPHINE LINKER HART, Judge, dissenting. I must respectfully dissent because I conclude that the Commission exceeded its powers in imposing a temporary surcharge for the purpose of creating this kind of program. Act 310 of 1981, codified at Ark. Code Ann. §§ 23-4-501 through 23-4-509 (Repl. 2002), provided a method by which a public utility could comply with legislative or regulatory requirements requiring the utility to "make substantial additional investments or incur additional expenses with respect to *existing facilities* used and useful in providing service to the utility's customers. . . ." Ark. Code Ann.

§ 23-4-501(a)(1) (Repl. 2002) (emphasis added). Further, the Act's emergency clause provided that its enactment was necessitated by the then-existing statutory framework's failure to "provide for a procedure to permit immediate recovery of additional expenditures with respect to existing *facilities*. . . ." (Emphasis added.) The emergency clause also provided that, prior to the passage of the Act, public utilities were required to "make expenditures to provide *facilities* . . . which costs cannot be recovered in a prompt and timely manner. . . ." (emphasis added). As noted by the majority, this Act enabled utilities to recover the costs associated with federally-mandated removal of asbestos from an existing facility. *Arkansas Oklahoma Gas Corp. v. Arkansas Pub. Serv. Comm'n*, 301 Ark. 259, 783 S.W.2d 350 (1990). There is no other Arkansas authority that has interpreted this statutory provision.

By contrast, I simply cannot envision how this surcharge could be considered an investment or an expense associated with a *facility*. I cannot conceive that the Legislature had this kind of program in mind when it limited surcharges to expenses and investments related to facilities. Arguably, this program may well have laudable goals. However, in the absence of a specific grant of authority by the Legislature to the Commission permitting the use of surcharges for this express purpose, I must conclude that the Commission exceeded its powers in implementing the surcharge.

I respectfully dissent.

ROAF, J., joins.