ARKANSAS GAS CONSUMERS, INC. *v.*
ARKANSAS PUBLIC SERVICE COMMISSION

02-1312 118 S.W.3d 109

Supreme Court of Arkansas
Opinion delivered September 18, 2003

---

38

*Rose Law Firm*, by: *Stephen N. Joiner* and *Charlene J. Kim*, for appellant.

*Charles J. Harder* and *Jeffrey L. Dangeau* for Reliant Energy Arkla and Arkansas Western Gas Company.

*Mike Beebe*, Att'y Gen., by: *Eric B. Estes*, Ass't Att'y Gen., for appellee.

*Gregory Glisich*, for appellee.

ROBERT L. BROWN, Justice. The appellant, Arkansas Gas Consumers, Inc. (Gas Consumers), appeals from orders of the appellee, the Arkansas Public Service Commission (PSC), which implemented the Temporary Low Income Customer Gas Reconnection Policy (Policy). Gas Consumers' primary argument is that the PSC exceeded its authority in creating the program. We agree that the legislative authority is lacking, and we reverse the orders of the PSC relevant to the Policy and further reverse the decision of the Arkansas Court of Appeals in this same cause.

The facts are these. On October 25, 2001, the PSC published *Order No. 1*, in which it proposed the Policy. The PSC noted that because of the harsh 2000-2001 winter and the resulting record-high natural gas prices, over 30,000 Arkansas gas customers were disconnected for nonpayment of gas bills, with 29,500 still disconnected. The PSC stated that these customers owed past-due bills generally ranging from an average of $261 to $350, with some customers owing in excess of $1000. The PSC further observed that in order to be reconnected for the 2001-2002 winter under existing regulations, these customers would have to make arrangements to pay all past-due amounts. They would also have to pay a reconnection fee and possibly a new service deposit. The PSC recognized that many of these customers were low-income families and that without assistance, they would face another winter without heat, which could threaten their health and safety. The PSC stated that, because the public interest required it, it would immediately consider an extraordinary program to assist these customers. The PSC proposed the Policy, which had as its salient points the reconnection of disconnected gas customers who qualified and payment of their past-due debt and future debt which would be assessed against all ratepayers and then repaid by Policy participants. The PSC set a deadline for comments relating to the Policy and set a date for a hearing on the matter for November 9, 2001. All three of Arkansas' gas utilities, Arkansas Oklahoma Gas Corporation (AOG), Reliant Energy Arkla (Arkla), and Arkansas Western Gas Company (AWG), as well as the Arkansas Attorney General, Gas Consumers, and the PSC's staff filed initial comments and replies regarding the PSC's proposal.

On November 9, 2001, the PSC held a public hearing on its proposed Policy. At the hearing, testimony was presented from those who filed initial comments and replies as well as from community members and former gas utility customers. That same day, the PSC issued *Order No. 2* in which it implemented the Policy. The Policy provided the following:

(1) Eligibility for the program covered those low-income customers disconnected from service for non-payment between January 1, 2001, and November 1, 2001, who remained disconnected as of the date of the order and whose familial income did not exceed 200% of the approved Federal Poverty Guidelines;

(2) Eligibility was to be determined by the gas utilities' customer service representatives based on information provided them by the low-income customers making requests to participate in the Policy; the final date for enrollment in the Policy was set for December 31, 2001;

(3) Debits and credits to be flowed through each Gas Companies' Purchased Gas Adjustment ("PGA") or Gas Supply Rate ("GSR") or by a bill line item were to be limited to the outstanding indebtedness of and payments received from those customers actually enrolled in the Policy.[1] Debits were to include not only a customer's then-existing past-due amount, but also any new unpaid debt incurred while participating in the Policy during the winter season (from November 1, 2001, to April 30, 2002);

(4) Credits were to include any payment received from Policy participants toward the outstanding debt debited to the PGA, GSR, or bill line item authorized by the Policy, whether incurred before admission to the program or during participation;

(5) Gas companies were permitted to recover the total bad-debt write-off for Policy participants against all ratepayers "over a single twelve (12) month amortization period[;]"

---

[1] AOG had problems adjusting its computer system to include Policy debits and credits within its PGA or GSR, and the PSC permitted that gas utility to charge ratepayers by a bill line item.

(6) After reconnection of a Policy participant, the PSC's *General Service Rules* regarding reconnection after cut-off and security deposits were once again to apply;

(7) All Policy participants were to remain in the levelized billing program at least for the term of the Delayed Payment Agreement;

(8) Each Policy Participant was to be mailed a copy of the Delayed Payment Agreement;

(9) Gas utilities were to cancel any contract for debt collection against any Policy participants upon enrollment in the Policy; and

(10) Gas utilities were to maintain all necessary records relating to the Policy for each participant in the program.

In accordance with the original proposal of the Policy, each low-income participant was to be reconnected, subject to the following conditions:

(1) Customers had to enter into a Delayed Payment Agreement (DPA) with the gas utility and agree to pay "a small amount" each month towards any past-due bill;

(2) The monthly DPA amount was to be determined based upon each participant's ability to pay; however, no DPA was to extend beyond a term of thirty-six months;

(3) Participants had to pay the utility's reconnection fee in full prior to service being restored; participants could not be billed for the reconnection fee;

(4) No new deposits were to be required by the utilities of any participant in the Policy;

(5) Participants had to agree to participate in the utility's levelized billing program.

On November 13, 2001, Gas Consumers filed a petition for rehearing alleging that the PSC exceeded its legislative authority by mandating the Policy. Gas Consumers also requested a stay and an expedited ruling. The next day, on November 14, 2001, the PSC issued *Order No. 3*, amending its *Order No. 2* and expanding

eligibility in the Policy to cover low-income customers disconnected for nonpayment between January 1, 2001, and December 31, 2001, and who also remained disconnected as of the date of the order or who were scheduled for disconnection on or before December 31, 2001.

Following a letter request for clarification by AOG, the PSC issued *Order No. 4* on November 19, 2001, which read:

> By Order No. 2, as amended by Errata Order No. 3, it was and remains the Commission's intent to provide a program that will enable low income residential customers disconnected from the natural gas utility system to be reconnected before the onset of cold weather. The TLICGRP is intended to assist certain low income customers [*i.e.*, those whose total family income does not exceed 200% of the currently approved Federal Poverty Guidelines] who are either currently disconnected or are scheduled to be disconnected by December 31, 2001, due to their default on payment for gas usage during the winter heating season of 2000-2001.

On December 12, 2001, Gas Consumers filed a second petition for rehearing and requested that the PSC reconsider *Order Nos. 3* and *4*. The next day, on December 13, 2001, the PSC issued *Order No. 5* in which it granted Gas Consumers' initial petition for rehearing solely for the purpose of consolidating both of Gas Consumers' petitions for rehearing. Finally, on January 9, 2002, the PSC issued *Order No. 6* in which it denied both of Gas Consumers' petitions for rehearing and found that its previous *Order Nos. 2, 3*, and *4* were supported by the public record and were in the public interest.

Gas Consumers appealed the PSC's decision to our court of appeals which affirmed the PSC. *See Arkansas Gas Consumers, Inc., v. Arkansas Pub. Serv. Comm'n*, 80 Ark. App. 1, 91 S.W.3d 75 (2002). Gas Consumers then petitioned this court for review, which we granted on January 30, 2003. When this court grants a petition for review from a decision by the court of appeals, it reviews the appeal as if it were originally filed in this court. *See Laird v. Shelnut*, 348 Ark. 632, 74 S.W.3d 206 (2002).

### I. Mootness

We first address whether the issue of Gas Consumers' appeal is moot. The Attorney General maintains that it is and points to

Gas Consumers' own petition for a writ of prohibition and stay of order before this court in *Arkansas Gas Consumers, Inc. v. Arkansas Pub. Serv. Comm'n*, No. 01-1274. In that petition, Gas Consumers stated that Policy-eligible customers were already enrolling in the Policy and that absent a stay, "any further contracts [would be] binding, and the utilities [would] not be required to make refunds of sums charged to the PGA or GSR mechanisms, even if the TLICGRP [the Policy] is revoked or found unlawful." The Attorney General contends that the finality of the Policy's implementation, as attested to by Gas Consumers, supports his mootness argument. In addition, the Attorney General maintains that there is no applicable remedy. He asserts that it is unlikely that any refund would be just and reasonable as the PSC affirmatively required the utilities to enter into long-term binding contracts with the Policy customers in this case.

Gas Consumers replies that this is a case capable of repetition and of evading review and further observes that it involves the public interest. Thus, Gas Consumers concludes, it falls within the exceptions to the mootness doctrine.

■ Gas Consumers correctly states the law. This court has held as follows regarding mootness:

> A case is moot when any judgment rendered would have no practical legal effect upon a then-existing legal controversy. *Arkansas Intercollegiate Conference v. Parnham,* 309 Ark. 170, 174, 828 S.W.2d 828, 831 (1992). As a general rule, this court does not address moot issues. *A.P. Leonards v. E.A. Martin Mach. Co.,* 321 Ark. 239, 900 S.W.2d 546 (1995); *Johnson v. State,* 319 Ark. 3, 888 S.W.2d 661 (1994). There are some exceptions to the general rule, such as cases which are capable of repetition yet evade review, *see Nathaniel v. Forrest City Sch. Dist.,* 300 Ark. 513, 780 S.W.2d 539 (1989), and cases involving the consideration of public interest and prevention of future litigation, *see Duhon v. Gravett,* 302 Ark. 358, 790 S.W.2d 155 (1990)....

*Thomas v. Arkansas Bd. of Corr.,* 324 Ark. 6, 8-9, 918 S.W.2d 156, 158 (1996).

■ Although the Attorney General contends that the case is moot due to there being no remedy available to Gas Consumers and that any chance of refund would not likely occur, this case falls within the exceptions to our mootness doctrine. Not only is this a

case of public interest because it involves the PSC's ability to provide low-income assistance programs, but it is also one capable of repetition at any time the PSC determined that an emergency was imminent due to the approaching winter months. Indeed, a program comparable to the Policy could be instituted by the PSC every winter. We conclude that it is appropriate for this court to reach the merits of this case.

## II. PSC's Legislative Authority

Gas Consumers claims, as its primary point, that the PSC did not have the authority from the General Assembly to establish the Policy. It asserts that the PSC's general authority to supervise and regulate public utilities does not include the authority to make public policy regarding low-income assistance or authority to provide funds for such assistance by assessing all ratepayers for the bad-debt expense. Gas Consumers maintains that mandating and implementing such a social program is the responsibility of the legislature and other state agencies. It further contends that the PSC cannot use the natural gas ratepayers as a supplemental source of funds for low-income assistance despite the PSC's good intentions. Gas Consumers also argues that Act 310 of 1981, codified in part at Ark. Code Ann. §§ 23-4-501 and 502 (Repl. 2002), which authorizes temporary surcharges, does not authorize the PSC to assess a surcharge against all ratepayers to provide funds for a low-income program like the Policy.

The PSC responds that because payments from Policy participants are credited back to all customers through the Purchased Gas Adjustment and Gas Supply Rate mechanisms, the reconnection of Policy participants benefits all ratepayers by reducing the overall level of system bad-debt expense and by recovering contributions to fixed costs that would otherwise be lost if customers remained disconnected. It further maintains that securing the well-being of many Arkansans who would otherwise likely be without heat, hot water, or cooking fuel during the winter months is within the statutory authority granted the PSC.

Arkla, AWG, and the Attorney General agree that the Policy was well within the PSC's authority to protect the public's interest with regard to gas utility service. They further assert that the PSC had the authority to provide the gas utilities with the ability to recover arrearages from Policy participants through the Purchased Gas Adjustment and Gas Supply Rate credits.

■ In *Ozark Gas Pipeline Corp. v. Arkansas Pub. Serv. Comm'n*, 342 Ark. 591, 29 S.W.3d 730 (2000), this court referred to the Public Utility Code for the appropriate standard of review:

> The General Assembly has provided the applicable standard of review of an APSC order by an appellate court:
>
> (3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.
>
> (4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

Ark. Code Ann. § 23-2-423(c)(3) and (4) (Repl.1997).

342 Ark. at 596-97, 29 S.W.3d at 732-33.

■ Using these legislative standards, we first examine the PSC's status. This court has held that the PSC is a creature of the General Assembly with its power and authority limited to that which the legislature confers upon it. *See Arkansas County v. Desha County*, 342 Ark. 135, 27 S.W.3d 379 (2000). Where the only issue is one of law which this court must answer, the court does not pass upon the wisdom of the PSC's actions or say whether the PSC has appropriately exercised its discretion. *See Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 267 Ark. 550, 593 S.W.2d 434 (1980). In addition, the judicial branch of government defers to the expertise of the PSC. *See id.* Judicial review is not, however, merely a formality; it is for the courts to decide whether the PSC has abused its discretion in an arbitrary or unwarranted fashion, even though considerable judicial restraint should be exercised in finding such an abuse. *See id.*

■ At issue in the case at hand is whether the PSC had the legislative authority to establish the Policy. When examining an issue of statutory construction, our cardinal rule is to give effect to the intent of the legislature. *See Hapney v. Rheem Mfg. Co.*, 341 Ark. 548, 26 S.W.3d 771 (2000). Where the language of a statute

is clear and unambiguous, this court determines legislative intent from the ordinary meaning of the language used. *See Ozark Gas Pipeline Corp. v. Arkansas Pub. Serv. Comm'n, supra.* Where the meaning is unclear, this court looks to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. *See Montgomery v. Bolton,* 349 Ark. 460, 79 S.W.3d 354 (2002).

We turn then to the legislative authority granted to the PSC in the Public Utility Code. The General Assembly has established the general jurisdiction and power of the PSC:

> The commission [defined as "the Arkansas Public Service Commission . . . with respect to the particular public utilities . . . over which each commission has jurisdiction"] is vested with the power and jurisdiction, and it is made its duty, to supervise and regulate every public utility defined in § 23-1-101 and to do all things, whether specifically designated in this act, that may be necessary or expedient in the exercise of such power and jurisdiction, or in the discharge of its duty.

Ark. Code Ann. § 23-2-301 (Repl. 2002). *See also* Ark. Code Ann. § 23-1-101 (Repl. 2002).

The specific powers of the PSC are enumerated in a subsequent section of the Code:

> (a) The commission, upon complaint or upon its own motion and upon reasonable notice and after a hearing, shall have the power to:
>
> (1) Find and fix just, reasonable, and sufficient rates to be thereafter observed, enforced, and demanded by any public utility;
>
> (2) Determine the reasonable, safe, adequate, and sufficient service to be observed, furnished, enforced, or employed by any public utility and to fix this service by its order, rule, or regulation;
>
> (3) Ascertain and fix adequate and reasonable standards, classifications, regulations, practices, and services to be furnished, imposed, observed, and followed by any or all public utilities[.]

Ark. Code Ann. § 23-2-304(a)(1-3) (Repl. 2002).[2]

■■ In addition, the Code empowers the PSC to make changes to · its ˙ reasonable rules "pertaining to the operation, accounting, service, and rates of public utilities" following a hearing and upon notice, both of which occurred here. Ark. Code Ann. § 23-2-305 (Repl. 2002). The term "rate" is broadly defined by the General Assembly to include "every compensation, charge, fare, toll, rental, and classification, or any of them, demanded, observed, charged, or collected by any public utility for any service, products, or commodity offered by it as a public utility to the public and means and includes any rules, regulations, practices, or contracts affecting any compensation, charge, fare, toll, rental, or classification[.]" Ark. Code Ann. § 23-1-101(10) (Repl. 2002).

■ The PSC premises its argument for implementing the Policy on this general ratemaking authority and its power to set standards and regulate utilities. We disagree that this ratemaking authority grants the PSC power to initiate the Policy. Other states have been disinclined to hinge such authority of their regulatory commissions on general ratemaking and regulatory authority. *See, e.g., Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n*, 754 P.2d 928 (Utah 1988). In *Mountain States Tel.*, the Utah Supreme Court struck down the pooling of a telephone carrier surcharge as a means of funding a program to make telephone service available to customers on state assistance. In doing so, the court said:

> While we agree that the public policy supporting the Commission's rules and orders establishing pooling is a valid concern, we find that this pooling procedure cannot be justified as part of the Commission's broad rate-making authority. Although the pooling

---

[2] By Act 204 of 2003, § 6, the General Assembly recently amended § 23-2-304(a) to include the following powers of the Commission among those already enumerated:

(9) Assure that retail customers should have access to safe, reliable, and affordable electricity, including protection against service disconnections in extreme weather or in cases of medical emergency or nonpayment for unrelated services; and

(10) Assure that electric utility bills, usage, and payment records should be treated as confidential, unless the retail customer consents to their release or the information is provided only in the aggregate. Notwithstanding this provision, release of such information may be made pursuant to subpoena, court order, or other applicable statute, rule or regulation.

of surcharges is connected to the supervision of rates as an attempt to maintain lower rates for non-Lifeline customers of independent companies, it is nevertheless an attempt to interrelate the rates of several otherwise unconnected companies, something not contemplated by the statutory language.

754 P.2d at 932. *See also Colorado Mun. League v. Public Utils. Comm'n,* 591 P.2d 577 (Colo. 1979) (commission lacked authority to effect social legislation by ordering that pay phone rates be reduced according to age and indigency classification); *Mountain States Legal Found. v. New Mexico State Corp. Comm'n,* 101 N.M. 657, 687 P.2d 92 (1984) (commission lacked authority to effect social policy through preferential ratemaking for telephone service for elderly and indigent); *Process Gas Consumers Group v. Pennsylvania Pub. Util. Comm'n,* 511 Pa. 88, 511 A.2d 1315 (1986) (commission's requirement that excess gas rate revenues be used for residential conservation programs exceeded commission's ratemaking authority). *But see Consumer Power Co. v. Assoc. of Bus. Advocating Tarriff Equity,* 205 Mich. App. 571, 518 N.W.2d 514 (1994) (where power company applied for rate surcharge on all customers to pay energy costs for poor persons, PSC had authority to approve rate surcharge); *American Hoechest Corp. v. Dept. of Pub. Utils.,* 379 Mass. 408, 399 N.E.2d 1 (1980) (where public utility requested a reduced electricity rate for the elderly poor, court held commission's jurisdiction over entire rate structure includes authority to implement reduced-rate electricity service for elderly poor as an experiment, with all customers bearing the cost). In both the *American Hoechest Corp.* case and the *Consumers Power Co.* case, it was the public utility that requested the rate reduction.

The PSC next maintains that its statutory authority relating to surcharges specifically authorizes programs like the Policy. Again, we disagree. The Public Utility Code contains two statutes that deal with the PSC's authority to implement surcharges without filing a general rate case. Act 310 of 1981, now codified in part at Ark. Code Ann. § 23-4-501 (Repl. 2002), provides:

> (a) It is recognized that legislative or administrative regulations impose certain legal requirements upon public utilities relating to the protection of the public health, safety, or the environment, and that:

(1) In order to comply with such legislative or regulatory requirements, utilities are required to make substantial additional investments or incur additional expenses *with respect to existing facilities* used and useful in providing service to the utility's customers; and

(2) Although such additional investments and expenses are necessary in order to provide service to the utility's customers, such additional investments and expenses are not included in the utility's rates and cannot be recovered in a prompt and timely fashion under existing regulatory procedures.

(b) It is intended by the General Assembly that utilities be permitted to recover in a prompt and timely manner *all such costs* incurred by utilities in order to comply with such legislative or regulatory requirements through an *interim surcharge* which, if approved, shall be effective until the implementation of new rate schedules in connection with the next general rate filing of the utility wherein such additional investments or expenses can be included in the utility's base rate schedules. However, the costs to be recovered through such an interim surcharge shall not include increases in the cost for employment compensation or benefits as a result of legislative or regulatory action.

Ark. Code Ann. § 23-4-501 (Repl. 2002) (emphasis added).

The second surcharge reference is also provided in Act 310 of 1981:

Any public utility as defined in § 23-1-101 may recover all costs and expenses reasonably incurred by such a utility as a direct result of legislative or regulatory requirements *relating to the protection of the public health, safety, and the environment* by filing with the Arkansas Public Service Commission, no more frequently than once every six (6) months, an interim rate schedule which would impose a *separate surcharge* in addition to its currently effective rates until the implementation of new rate schedules in connection with the next general rate filing of the utility wherein such additional expenditures can be included in the utility's base rate schedules.

Ark. Code Ann. § 23-4-502 (Repl. 2002) (emphasis added).

 Two concerns immediately surface in using these two surcharge statutes as authority for the PSC's Policy program. The

first is that the statutes contemplate *the utility's* request to recover the additional expenses under both § 23-4-501 and § 23-4-502. In the instant case, it was the PSC that developed the Policy, mandated it, and implemented it. The Policy and its surcharge on all ratepayers were not the result of a utility request for a surcharge, as the statutes contemplate.

Secondly, § 23-4-501 speaks in terms of "additional expenses with respect to existing facilities" and recovery through an interim surcharge of "such costs." The Policy does not fall within the ken of expenses associated with an existing facility. Nor does the Policy fall into the category of "expenses reasonably incurred by such a utility as a direct result of legislative or regulatory requirements relating to the protection of the public health, safety, and the environment" under § 23-4-502. According to the PSC and other appellees, this language in § 23-4-502 gives the PSC *carte blanche* authority to adopt and implement any public health or safety program of its choosing and assess the ratepayers for the cost. We do not read the statute that broadly.

In fact, the PSC's authority is narrowly defined in the two surcharge statutes. An asbestos removal case, *Arkansas Oklahoma Gas Corp. v. Arkansas Public Service Comm'n*, 301 Ark. 259, 783 S.W.2d 350 (1990), is a prime example of a proper surcharge and appears to be the only case decided by this court under § 23-4-502. Asbestos removal was mandated by a federal regulation and related to existing facilities. The facts of *Arkansas Oklahoma Gas Corp.* clearly fit within the explicit parameters of § 23-4-502, and we held that the ensuing surcharge was appropriate.

The whole focus of Act 310 of 1981 is to authorize surcharge authority in the PSC for increased costs relating to existing facilities caused by compliance with legislative or regulatory requirements. This is not only spelled out by the legislative intent of Act 310 codified in § 23-4-501, but also appears in the Act's Emergency Clause, which reads in part:

> Existing statutes of this State do not provide for a procedure to permit immediate recovery of additional expenditures with respect to existing utility facilities incurred by public utilities as a result of legislative or regulatory requirements without the filing of a general rate case with the Public Service Commission. These circumstances result in a gross inequity in that utilities must make expenditures to provide facilities which are clearly in the public interest which costs

cannot be recovered in a prompt and timely manner by the utility. Therefore, an emergency is declared to exist, and this Act being necessary for the preservation of the public peace, health, and safety, shall take effect and be in force from and after the date of its passage and approval.

Again, this establishes the legislative intent for both § 23-4-501 and § 23-4-502. Aside from the fact that the utilities did not seek a surcharge, the Policy is not the result of a legislative or regulatory requirement relating to an existing facility. Accordingly, the appellees' reliance on these sections is misplaced.

■ Bolstering our interpretation that existing statutes do not give the PSC authority to mandate the Policy is the fact that the PSC has previously recognized it has no authority to provide low-income assistance by virtue of its *Order No. 17* in Docket No. 97-451-U. *Order 17* discusses whether a utility should provide assistance to economically-disadvantaged persons in paying their bills or in reducing the bills through weatherization measures in the PSC's Draft Report on Restructuring the Arkansas Electric Utility Industry. *See Order No. 17*, Docket No. 97-451-U, Arkansas Pub. Serv. Comm'n. That situation is somewhat different from the situation at hand in that here, each participant in the Policy is fully responsible for any past-due bill, as well as the reconnection service fee. Moreover, no discount was given to Policy participants, and all persons, Policy participants and non-participants, were to pay the same amount for any gas consumed. Regardless of these distinctions, in 1997, the PSC clearly recognized by virtue of *Order No. 17* that its authority was limited as far as establishing a low-income assistance program. *See Order No. 17, supra* ("Nevertheless, whether utilities should provide [such assistance] or whether they should come from direct tax revenues is a question of state and federal legislation.").

■ We are further influenced by the fact that with Act 204 of 2003, the General Assembly amended § 23-2-304, which lists the PSC's powers, specifically investing the PSC with new authority to assure that retail customers have electricity, including protection against service disconnections in bad weather. No comparable power is given to the PSC regarding natural gas. It is important to note that rather than clarifying an existing power, the General Assembly *added* a new power to Ark. Code Ann. § 23-2-

304. The General Assembly is presumed to have intended a change in the law where it has been made by a substantive statutory amendment rather than a mere clarification of existing law. *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 22:30 (6th ed. 2002). The addition of a new power in the PSC is clearly a change in the law. We view this new act by the General Assembly as recognition of the fact that no such power previously was vested in the PSC for the provision of electricity in inclement weather, and, of course, no such power presently exists relating to natural gas.

 We further note that several states provide for low-income assistance programs by statute, including California's statute which expressly provides for a surcharge on natural gas:

> (a) On and after January 1, 2001, there shall be imposed a surcharge on all natural gas consumed in this state. The commission shall establish a surcharge to fund low-income assistance programs required by Sections 739.1, 739.2, and 2790 and cost-effective energy efficiency and conservation activities and public interest research and development authorized by Section 740 and not adequately provided by the competitive and regulated markets. Upon implementation of this article, funding for those programs shall be removed from the rates of gas utilities.

Cal. Pub. Util. Code § 890(a) (2002). *See also* Idaho Code § 56-904 (2002) (surcharge for telephone assistance program in Idaho); N.M. Stat. Ann. § 63-9H-6 (Repl. 1999) (surcharge for low-income telephone assistance in New Mexico); R.I. Gen. Laws § 39-1-27.5 (Reenact. 1997) (surcharge on ratepayers to assist electric utilities in earning six percent return on common equity not assessed against low-income customers in Rhode Island); Tex. Util. Code Ann. § 56.155 (Supp. 2003) (surcharge for telecommunications assistance program in Texas). Comparable surcharge authority to implement the Policy is lacking in Arkansas. We hold that the PSC did not have the statutory authority to develop and mandate the Policy.

### III. Sliding-Scale Rates

If the Policy surcharge is unauthorized under the surcharge statutes, §§ 23-4-501 and 502, the next question is whether the Policy constitutes part of a lawful sliding-scale rate as contemplated under Ark. Code Ann. § 23-4-108 (Repl. 2002). We believe it does not.

Gas Consumers claims that the Policy constitutes a general rate increase which must be addressed in a general rate case, as set out under Ark. Code Ann. § 23-4-401. Gas Consumers submits that a traditional rate case permits a utility to recover its legitimate expenses, both ordinary and extraordinary. It asserts that once the door is opened for interim ratemaking relief, the resulting precedent would generate numerous requests for any unanticipated expenses that a utility perceives as worthy of special recovery. It further contends that the PSC's approach to recovering utility bad-debt expenses is prohibited by statute and regulation, even if the PSC had the authority to fashion public-assistance programs.

The PSC responds that Gas Consumers cites no statute or regulation from which it could be concluded that prohibited single-issue ratemaking occurred in its treatment of utility bad-debt expenses. Arkla and AWG further respond that Gas Consumers' argument ignores the fact that § 23-4-108, which authorizes the PSC to fix a reasonable and just sliding scale of rates for public utilities, applies. Section 23-4-108, the utilities claim, permits an automatic adjustment of charges for utility service in relation to the expenses of the operation to be incurred. The Attorney General responds that the statute relating to a general rate case does not apply in the instant case, because that procedure only applies when a utility requests a change or modification to its rates or charges. The Attorney General submits that in this case the Policy was mandated by the PSC and not requested by a utility. Thus, the Policy did not emanate from a petition by the utilities, and Gas Consumers' contention must be rejected.

This issue calls into play the sliding-scale or escalator-clause statute, which reads:

> (a)(1) Nothing in this act shall be taken to prohibit a public utility from establishing or entering into an agreement for a fixed period for a sliding scale or automatic adjustment of charges for public utility service in relation to the dividends to be paid to stockholders of the public utility, or the profit to be realized, or its expenses of operation to be incurred, or other equitable or reasonable basis for the scale or adjustment if a schedule showing the rates under the arrangement is first filed with and approved by the commission.
>
> (2) Nothing in this section shall prevent the commission from revoking its approval at any time and fixing other rates and charges

for the *product or commodity or service* if, after reasonable notice and hearing, the commission finds the existing rates or charges unjust, unreasonable, insufficient, or discriminatory.

(b) The commission shall have the power to fix a reasonable and just sliding scale of rates for public utilities.

Ark. Code Ann. § 23-4-108 (Repl. 2002) (emphasis added).

 This court has held that § 23-4-108 appeared to be "an abbreviated procedure whereby the utility rates can be raised or lowered depending on one item (or at least a very few items) affecting income or expenses of the utility, such as in the present case where an increase in the utility rate depends on the price the Company is required to pay for the purchased gas for distribution." *City of El Dorado v. Arkansas Pub. Serv. Comm'n*, 235 Ark. 812, 834, 362 S.W.2d 680, 693 (1962). In *City of El Dorado*, this court observed that "apparently it was the desire of the legislature to avoid such a lengthy and expensive hearing to make what might be termed minor adjustments" by virtue of the General Assembly's enactment of Act 324 of 1935, set out in Ark. Stat. Ann. § 73-219, the predecessor statute to § 23-4-108. *Id.*, 362 S.W.2d at 693. *See also Aluminum Co. of America v. Arkansas Pub. Serv. Comm'n*, 226 Ark. 343, 289 S.W.2d 889 (1956) (adjustment in rates due to gas prices properly included in proposed rate increase under sliding scale statute). The court ultimately affirmed the PSC's approval of an escalator clause in *City of El Dorado*, where the gas company would receive a rate increase or decrease depending on the rise or fall of the price of gas incurred by the utility.

 In reading § 23-4-108, the *City of El Dorado* case which discusses the escalator clause, and the *Aluminum Co. of America* case, it is clear that the sliding scale relates to adjustments to rates and charges to "product or commodity or service." The focal point, accordingly, is on gas production and delivery of gas service to the ratepayers and not on rate adjustments to fund new social programs like the Policy. This is confirmed by the Emergency Clause for Act 324 which reads in part:

It is found that the statutes of this state for the regulation of public utilities are insufficient, inadequate, and do not afford to the public, or the public utilities, of the state, speedy and adequate relief

from excessive or insufficient rates, and that many of the rates of public utilities operating in this state are not what they should be, thereby entailing a grave injustice on the public or the utilities[.]

Indeed, the *El Dorado* case and the *Aluminum Co. of America* case both dealt with rate adjustments to customers caused by the increased cost of gas. That is not what is involved in the case at hand. Here, we are not confronted with increased costs due to gas production but with an independent social program crafted by the PSC to pay customer bad debt to the utilities and allow disconnected customers to reconnect in time for the next winter.

We conclude that the Policy cannot be salvaged under § 23-4-108.

### IV. Double Recovery of Bad-Debt Expenses

We must also confess to concern about double recovery for bad debt due to implementation of the Policy. Gas Consumers argues that the utilities' existing rate bases include an allowance for bad debt. It contends that requiring ratepayers to make an additional direct payment through utilities' Purchased Gas Adjustment or Gas Supply Rate tariffs for the bad debt of Policy participants means that the utilities are impermissibly recovering bad-debt expenses twice, which violates the requirement that utility rates be just and reasonable.

The PSC responds that the last time base rates were set for Arkansas gas utilities was in 1996 and 1997. It maintains that because of the extraordinary circumstances of winter 2000-2001, the level of bad debt contained in those rates has been greatly exceeded. The PSC further contends that the only bad-debt expense being recovered under the Policy is that attributable to Policy participants and that the Policy accelerates bad-debt recovery. Arkla, AWG, and the Attorney General agree that the winter of 2000-2001 resulted in extraordinary gas expenses and unprecedented bad debt necessitating the Policy. The Attorney General adds that should the PSC believe that a double recovery has occurred, it can require the utilities to file a general rate case to remedy excessive profits.

Gas Consumers cites a paucity of authority in support of its contention, but its premise that double recovery of bad debt occurred, at least to some degree, appears to be obvious. A bad-debt expense was built into the rate base and with the

implementation of the Policy, the bad debt for disconnected customers attributable to the 2000-2001 winter is again surcharged to all ratepayers. The PSC and utilities argue that the Policy was needed to pay bad debt because it was an exceedingly bad winter. Yet, variation in the harshness of winters and any resulting bad debt from one winter to the next would necessarily have been factored into the rate base.

Nevertheless, because we are unable to glean from the record before us the extent of double recovery for bad debt, we refrain from reversing on this issue.

*V. Conclusion*

We recognize the fact that the Policy has been fully implemented and that the surcharge on the gas rates of all gas customers has already transpired. Nonetheless, we hold that the PSC lacks the statutory authority to mandate such a program, commendable though it may be, in future years. Our discussion today is not intended to in any way limit or hamper legitimate surcharges relating to legislative or regulatory requirements re-garding existing facilities under §§ 23-4-501 and 23-4-502, or sliding-scale rates tied to gas production and service as set out in § 23-4-108. It goes only to the features of the Policy which is a categorically different program and one which the PSC had no legislative authority to develop and mandate. As a final point, we recognize that there are other means of producing low-income assistance. Voluntary contributions by the ratepayers or the inclu-sion of charitable aid in a utility's rate base immediately come to mind. Statutory authority, however, currently does not exist for an emergency surcharge such as that mandated by the Policy.

A word about the dissent. The dissent refers to the broad ratemaking authority in the PSC, and we agree that it exists. What the dissent fails to cite is any statutory or case authority in Arkansas or in any other jurisdiction where the PSC, on its own volition, is authorized to assess all ratepayers with payment of bad debt incurred by low-income ratepayers and with the cost of imple-menting a low-income assistance program. Furthermore, under the plain language of the Arkansas surcharge statutes (§§ 23-4-501 and 502), it is the public utility that initiates the surcharge by filing

a request with the PSC. The clear language of the statutes does not empower the PSC to do this without a public utility request.

In addition, as already emphasized in this opinion, the surcharge statutes, which are codifications of Act 310 of 1981, tie the surcharges to existing facility costs and costs directly related to legislative or regulatory requirements. There is no authority granted for the implementation of social programs. The same holds true of sliding-scale ratemaking, where the statutory language (§ 23-4-108), and our cases, refer to costs associated with gas production and service to the ratepayers, not low-income assistance programs.

In short, what the dissent fails to address is that nowhere in the Utility Code is the PSC, on its own motion, given the legislative authority to pay off the bad debt of low-income customers by assessing all ratepayers; nor is authority granted to the PSC to continue that assessment on all ratepayers to fund a low-income assistance program for the ensuing winter months. Had the General Assembly intended the PSC to have this additional authority, it could have easily provided for it as did California. *See* Cal Pub. Util. Code § 890(a) (2002). But it did not.

Reversed.

ARNOLD, C.J., GLAZE and THORNTON, JJ., dissent.

W.H. "DUB" ARNOLD, Chief Justice, dissenting. The majority holds that the Arkansas Public Service Commission ("Commission") lacks the legislative authority to create a policy establishing a plan to reconnect natural gas service to residential customers who had been disconnected for failure to pay their gas bills incurred in the severe winter of 2000-01. Because our statutes give the Commission broad authority to implement such a policy, I respectfully dissent.

*Historical Background*

Because of extremely cold weather during the winter of 2000-2001, more than 30,000 residential gas customers in Arkansas were disconnected from service for non-payment of their natural-gas bills, which ranged from $261.00 to $350.00. As of October 25, 2001, 29,500 natural-gas customers remained disconnected, and many other customers were scheduled to have their

natural gas disconnected.[1] Once these residential customers were disconnected due to nonpayment, those customers would have been required to pay all delinquencies and a connection fee prior to reconnection in accordance with their previously approved rate schedule. In addition, these customers could also be required to pay a deposit equal to their two highest past bills. The disconnection and reconnection policies had been established by rate and tariff schedules approved by the Commission. For many low-income families in this state, the use of these existing policies was simply not an option. Many of these disconnected homes were occupied by low-income families that were financially unable to raise the money necessary to have their disconnected-gas service restored. Without modification of these previously approved tariffs, many of these low-income families were facing winter without heat for their homes.

Recognizing that another winter season was about to begin, and also in anticipation of another winter of high natural-gas costs, the Commission determined that the public interest required the expeditious reconsideration of the previously approved policies for reconnection, and the consideration of a modified reconnection policy appropriate to low-income families. The Commission scheduled a public hearing in docket number 01-248-U with the express purpose of considering the implementation of a "Temporary Low Income Customer Gas Reconnection Policy" ("TLICGRP"). The stated goal of this policy was to provide assistance to such families in getting service connected before the onset of winter weather. Under the TLICGRP, eligible low-income customers' gas utility service could be connected under certain conditions, including (1) entering into a delayed-payment agreement to pay the past due balances, (2) paying the utility's reconnection fee, and (3) participating in a levelized payment program. Eligible customers were not required to make a connection deposit equal to the two highest bills as required under previously existing regulations. The TLICGRP was available for eligible customers until December 31, 2001. The eligibility for the revised schedules pertaining to the installment plan connection rate schedule was limited to certain low-income customers whose household income did not exceed 200% of the federal poverty

---

[1] None of the members of Arkansas Gas Consumers, Inc. were disconnected from service, and the rules and regulations applicable to connection and disconnection of residential service were not applicable to non-residential customers.

guidelines. The utility companies were allowed to recover past due and unpaid balances from TLICGRP participants through the utilities' purchased gas adjustment ("PGA") or gas supply rate ("GSR") mechanisms, applicable to all customers, provided however, that installment payments made by such customers were to be applied to reduce the past due balances.[2]

After comments were received, a public hearing was conducted on November 9, 2001. On that same day, in Order No. 2, the Commission ordered the utilities to begin implementing the TLICGRP. All of the utility companies complied with the Commission's modifications of their rate schedules by accepting an installment payment of past due accounts coupled with an agreement for levelized bill payments and other provisions of the plan by participating customers. The utilities were required to cease other efforts to collect past delinquent bills from customers participating in the plan, but an allowance to reduce the amount of delinquencies was established. Periodic payments by the participating customers reduced the bad-debt account.

On November 13, 2001, appellant, a group of non-residential purchasers of gas known as the Arkansas Gas Consumers, Inc. ("AGC") requested that the Commission reconsider its Order No. 2. AGC is comprised of industrial, manufacturing, and agricultural firms with facilities located throughout Arkansas. On November 14, 2001, the Commission issued Order No. 3, which amended portions of Order No. 2. On November 15, 2001, appellant requested clarification of the Commission's previous order, which was addressed in Order No. 4 issued by the Commission on November 19, 2001.

On December 12, 2001, appellant requested reconsideration of Orders Nos. 3 and 4. The next day, the Commission issued Order No.5, in which appellant's petition was granted for the limited purpose of consolidating the request for rehearing, of Order No. 2 with the request for rehearing of Order Nos. 3 and 4. The Commission denied appellant's request for rehearing of Order Nos. 2, 3, and 4 by Order No. 6 issued on January 9, 2002.

From the Commission's actions, appellant filed a notice of appeal with our court of appeals. After considering the arguments

---

[2] Many of the industrial and commercial companies included in appellant's group were not subject to this increased cost.

and the evidence, the court of appeals affirmed the Commission. *See Arkansas Gas Consumers, supra.* Thereafter, we accepted review of this case.

### The Commission's Legislative Authority

AGC argues that the Commission exceeded its statutory authority in establishing the TLICGRP. Specifically, AGC contends that the Commission's general authority to regulate public utilities does not include the implementation of a connection policy designed to provide the choice of making installment payments of past-due accounts in order to be connected to utility services and other modifications, as set out in the TLICGRP.

### A. Whether the Commission exceeded its authority

First, I will address the issue whether the establishment of the TLICGRP exceeded the authority of the Commission to regulate rates and tariffs pertaining to utility services provided by a public utility. The Commission is a creature of the legislature and must act within the power conferred upon it by legislative act. *See Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 267 Ark. 550, 593 S.W.2d 434 (1980). The Commission has broad discretion in exercising its regulatory authority, and courts may not pass upon the wisdom of the Commission's actions or say whether the Commission has appropriately exercised its discretion. *Russellville Water Co. v. Arkansas Pub. Serv. Comm'n*, 270 Ark. 584, 606 S.W.2d 552 (1980). The Commission exercises legislative authority when it "looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Southwestern Electric Power Co. v. Coxsey*, 257 Ark. 534, 518 S.W.2d 485 (1975) (quoting with approval the Supreme Court decision of *Prentiss v. Atlantic Coastline Co.*, 211 U.S. 210 (1908)).

The issue presented is a matter of interpreting statutes granting the Commission regulatory authority over utility services. Our basic rule of statutory construction is to give effect to the legislative intent underlying the statute. *Kildow v. Baldwin Piano & Organ*, 333 Ark. 335, 969 S.W.2d 190 (1998); *Vanderpool v. Fidelity & Cas. Ins. Co.*, 327 Ark. 407, 939 S.W.2d 280 (1997). When a statute is plain and unambiguous, an appellate court should give the language of the statute its plain and ordinary meaning, *see Kildow, supra,* but when the statute is ambiguous, an appellate court

is permitted to look to the language of the statute, its subject matter, the object to be accomplished by the statute, the purpose to be served, and other appropriate matters. *See Alltel Mobile Communications, Inc. v. Arkansas Pub. Serv. Comm'n,* 63 Ark. App. 197, 975 S.W.2d 884 (1998). As a guide in ascertaining the legislature's intent, the court examines the history of the statutes involved, as well as the contemporaneous conditions at the time of their enactment, the consequences of interpretations, and all other matters of common knowledge within the court's jurisdiction. *Southwestern Bell Tel. Co. v. Arkansas Pub. Service Comm'n,* 68 Ark. App. 148, 5 S.W.3d 484 (1999). The interpretation of a statute is a judicial function, and the Commission's construction is not binding on the court. *See Omega Tube & Conduit Corp. v. Maples,* 312 Ark. 489, 850 S.W.2d 317 (1992). Nevertheless, the interpretation given a statute by a quasi-judicial tribunal charged with its execution is highly persuasive, and while not conclusive, neither should it be overturned unless it is clearly wrong. *Id.* Accordingly, we must examine the statutes creating the Commission's jurisdictional authority.

The Commission's authority relating to the rates and conditions of utility service is broadly stated in Ark. Code Ann. § 23-2-301 (Repl. 2002), which provides:

> The commission is vested with the power and jurisdiction, and it is made its duty, to supervise and regulate every public utility defined in section 23-1-101 and *to do all things,* whether specifically designated in this act, *that may be necessary or expedient in the exercise of such power and jurisdiction, or in the discharge of its duty.*

*Id.* (emphasis added). *See also* Ark. Code Ann. § 23-1-101 (Repl. 2002).

Following the broad foregoing grant of authority to do all things "necessary or expedient in the exercise of such power and jurisdiction, or in the discharge of its duty," the General Assembly, without limiting the general authority granted by the statute, specifically designated and enumerated some of those powers in Ark. Code Ann. § 23-2-304(a) (Repl. 2002), which provides in pertinent part:

> (a) The commission, upon complaint, or upon its own motion, shall, upon reasonable notice and after a hearing, have the power to:

(1) Find and fix just, reasonable, and sufficient rates to be thereafter observed, enforced, and demanded by any public utility;

(2) Determine the reasonable, safe, adequate, and sufficient service to be observed, furnished, enforced, or employed by any public utility and to fix this service by its order, rule, or regulation;

(3) Ascertain and fix adequate and reasonable standards, classifications, regulations, practices, and services to be furnished, imposed, observed, and followed by any or all public utilities[.]

*Id.*

Subsection (1) of § 23-2-304(a) authorizes the Commission to "find and fix just, reasonable, and sufficient rates." The Commission is further vested with the sole and exclusive jurisdiction and authority to determine the rates to be charged by utilities. Ark. Code Ann. § 23-4-201(a) (1987). In addition, the Commission has the responsibility, when faced with unreasonable rates, to fix reasonable ones. Ark. Code Ann. § 23-4-101(b) (1987). In its rate-making capacity, the Commission performs a legislative function that has been delegated to it, and it was created to act for the General Assembly. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm.*, 267 Ark. 550, 593 S.W.2d 434 (1980).

Subsection (2) of § 23-2-304(a), set out above, confirms the authority of the Commission to "[d]etermine the reasonable, safe, adequate, and sufficient service" to be provided by a public utility. In order to determine what these terms mean, we can look to Ark. Code Ann. § 23-3-113 (Repl. 2002) for guidance. Section 23-3-113 provides:

(a) Every public utility shall furnish, provide, and maintain such adequate and efficient service, instrumentalities, equipment, and facilities as shall promote the safety, health, comfort, requirements, and convenience of its patrons, employees, and the public.

(b) Every person, firm, or corporation engaged in a public service business in this state shall establish and maintain adequate and suitable facilities, safety appliances, or other suitable devices and shall perform such service in respect thereto as shall be reasonable, safe, and sufficient for the security and convenience of the public and the safety and comfort of its employees, and, in all respects, just and fair, and without any unjust discrimination or preference.

*Id.* These utilities are "directly related to the continued health, safety, and welfare of the citizens of Arkansas." Ark. Code Ann. § 23-3-301(a) (Repl. 2002).

Subsection (3) of Ark. Code Ann. § 23-2-304(a) specifically confirms the authority of the Commission to "[a]scertain and fix adequate and reasonable standards, classifications, regulations, practices, and services to be furnished, imposed, observed, and followed by any or all public utilities."

Based upon our rules of statutory construction, I maintain that the General Assembly's intent was to give the Commission full authority to establish policies relating to the connection and disconnection of utility services, such as those contained in the TLICGRP. After several amendments, the Commission implemented the TLICGRP, which provides:

1. Eligibility for the TLICGRP is expanded to cover those low income customers who were disconnected from gas service for non-payment between January 1, 2001, and December 31, 2001, and who remain disconnected as of the date of this order [November 14, 2001] or who are scheduled to be disconnected for non-payment on or before December 31, 2001, and whose total family income does not exceed 200 percent of the currently approved Federal Poverty Guidelines.

2. Eligibility shall be determined by each Gas Companies' customer service representatives based upon the information provided directly to the customer service representatives by each low income customer making a request to participate in the TLICGRP. Third party certification will not be required. Once a customer is determined to be eligible by the customer service representative, the process of reconnection can begin. The final date for enrollment in the TLICGRP shall be December 31, 2001.

3. Debits and credits to be flowed through each Gas Companies' Purchased Gas Adjustment ("PGA") or Gas Supply Rate ("GSR") or by a bill line item shall be limited to the outstanding indebtedness of and payments received from only those customers actually enrolled in the TLICGRP. Eligible debits shall include not only existing past due amounts when the customer enrolls in the TLICGRP but also new unpaid debt incurred while the customer is a participant in the program for usage during the current winter

heating season (defined as the billing period beginning November 1, 2001, and ending April 30, 2002). Credits shall include all payments received from any customer in the TLICGRP program toward the outstanding debt that has been debited to the PGA, GSR or bill line item as authorized herein, whether incurred prior to enrollment or during participation in the program. The gas companies shall be allowed to recover the total bad debt write-off for enrolled customers over a single twelve (12) month amortization period.

4. For the reasons stated in its written and oral comments, AOG shall be allowed to make the appropriate TLICGRP debits and credits through a bill line item adjustment rather than through its PGA. Specific language for such bill line item shall be submitted for pre-approval to the Staff prior to inclusion on any customer's bill.

5. After an eligible customer has been reconnected pursuant to the TLICGRP, the Commission's General Service Rules regarding reconnection after cut-off and customer deposits shall once again be applicable to such customer in the case of subsequent default. Further, the waiver of the "five-day" rule shall apply only through the end of this winter heating season. Given that winter weather is fast approaching, the Gas Companies are encouraged to enroll and connect eligible customers as expeditiously as possible.

6. Each customer reconnected through the TLICGRP shall remain in the levelized billing or average payment program for at least as long as the term of the Delayed Payment Agreement.

7. A copy of a Delayed Payment Agreement executed pursuant to the TLICGRP shall be mailed to the customer.

8. The Gas Companies shall cancel any debt collection contract initiated with any collection agency regarding an individual customer once that customer has enrolled in the TLICGRP program.

9. The Gas Companies shall maintain all necessary records related to the TLICGRP for audit purposes, including but not limited to, usage, billing, and payment records for each customer participating in the program.

The Commission's intent relating to the establishment of the TLICGRP program is revealed in Order No. 4, filed on November 19, 2001. The order states:

> [I]t was and remains the Commission's intent to provide a program that will enable low income residential customers disconnected from the natural gas utility system to be reconnected before the onset of cold weather. The TLICGRP is intended to assist certain low income customers [those customers whose family income does not exceed 200 percent of the currently approved Federal Poverty Guidelines] who are either currently disconnected or are scheduled to be disconnected by December 31, 2001, due to their default on payment for gas usage during the winter heating season of 2000-2001.

Generally, under the broad powers granted under § 23-2-301, the Commission has the statutory authority to implement a gas connection policy. Specifically, under § 23-2-304(a)(1), the Commission had the authority to "find and fix just, reasonable, and sufficient rates." The term *rate* is defined to include "every compensation, charge, fare, toll, rental, and classification, or any of them, demanded, observed, charged, or collected by any public utility for any service, products, or commodity offered by it as a public utility to the public and means and *includes any rules, regulations, practices, or contracts affecting any compensation, charge, fare, toll, rental, or classification*[.]" Ark. Code Ann. § 23-1-101(10) (Repl. 2002) (emphasis added). Here, the Commission, acting within its rate-making capacity, had authority to adapt the TLICGRP policies to modify tariffs relating to connection of utility services whereby certain utility customers can pay their past-due debt in installments.

Further, under § 23-2-304 (a)(2), the Commission is directed to "[d]etermine the reasonable, safe, adequate, and sufficient service," and § 23-3-113 also expresses the public policy that the service is "reasonable, safe, and sufficient for the security and convenience of the public. . . [.]"

*B. Authority for surcharges*

The majority holds that the Commission committed reversible error in allowing a surcharge to be imposed on all customers to offset the effect of the Commission's order that utilities forego attempts to collect participating customers' unpaid bills while the

participating customers were given time to pay those past-due balances. Notwithstanding that the Commission had authority to adopt the TLICGRP, the AGC contends that the imposition of a surcharge on gas bills for all domestic customers to offset the effect of requiring the utilities to cease efforts to collect past-due accounts owed by participating customers exceeded the authority of the Commission, or constituted reversible error. I disagree.

This court has held in several cases that the Commission has authority to approve surcharges to offset specific costs of providing utility services. In *Arkansas Oklahoma Gas Corp. v. Arkansas Pub. Serv. Comm'n*, 301 Ark. 259, 783 S.W.2d 350 (1990), we approved the recovery of costs associated with asbestos removal. In *City of El Dorado v. Arkansas Pub. Serv. Comm'n*, 235 Ark. 812, 362 S.W.2d 680 (1962), we approved a surcharge on customers' gas bills to compensate for municipal franchise taxes that exceeded the standard level of such taxes approved by the Commission. Also in *City of El Dorado, supra,* we approved an increase in the monthly minimum service charge to offset specific additional costs. The approval of these surcharges did not require a petition for a general rate increase.

Not only has this court recognized the general authority of the Commission to approve surcharges to offset specific increases in costs, the General Assembly has enacted statutes specifically confirming the Commission's authority to do so and directing that surcharges are appropriate when a utility incurs additional expenses that cannot be recovered in a prompt and timely fashion.

Arkansas Code Annotated § 23-4-501 *et seq.* (Repl. 2002) provides:

> (a) It is recognized that legislative or administrative regulations impose certain legal requirements upon public utilities relating to the protection of the public health, safety, or the environment, and that:
>
> (1) In order to comply with such legislative or regulatory requirements, utilities are required to make substantial additional investments or incur additional expenses with respect to existing facilities used and useful in providing service to the utility's customers; and

(2) Although such additional investments and expenses are necessary in order to provide service to the utility's customers, such additional investments and expenses are not included in the utility's rates and cannot be recovered in a prompt and timely fashion under existing regulatory procedures.

(b) It is intended by the General Assembly that utilities be permitted to recover in a prompt and timely manner *all such costs* incurred by utilities in order to comply with such legislative or regulatory requirements through an interim surcharge which, if approved, shall be effective until the implementation of new rate schedules in connection with the next general rate filing of the utility wherein such additional investments or expenses can be included in the utility's base rate schedules. However, the costs to be recovered through such interim surcharge shall not include increases in the cost for employment compensation or benefits as a result of legislative or regulatory action.

*Id.* (emphasis added).

As set out above, the General Assembly has expressly articulated the public policy allowing the recovery of such costs incurred by utilities through an "interim surcharge," and the only exclusion provided by the legislature is for the "increases in the cost for employment compensation or benefits as a result of legislative or regulatory action." Based upon our standard of review, I conclude that the Commission had the authority to assess interim charges.

As a further reflection of public policy articulated by the General Assembly, Ark. Code Ann. § 23-4-502 (Repl. 2002), provides:

Any public utility as defined in 23-1-101 *may recover all costs and expenses reasonably incurred by such utility as a direct result of legislative or regulatory requirements relating to the protection of the public health, safety, and the environment by filing with the Arkansas Public Service Commission,* no more frequently than once every six (6) months, an interim rate schedule which would impose a separate surcharge in addition to its currently effective rates until the implementation of new rate schedules in connection with the next general rate filing of the utility wherein such additional expenditures can be included in the utility's base rate schedules.

*Id.* (emphasis added).

In sum, our statutory law and our case law are consistent in recognizing that the Commission has authority to change existing provisions relating to connection and disconnection of gas service. Moreover, the Commission has the power to establish new and temporary provisions as part of the rates, terms, and conditions of service regularly promulgated by the Commission to be implemented by the filing of appropriate rate schedules and conditions of service by the utility companies. In my view, the Commission clearly had the authority to enter its order establishing the terms and conditions for reconnection of utility services through the TLICGRP.

*Sliding-Scale Rates*

Appellant argues that the TLICGRP constitutes a general rate increase that must be addressed in a general rate case. Specifically, appellant contends that the provision for the recovery of past-due debt in the TLICGRP is an unlawful single-issue rate-making. Appellant argues that the establishment of the TLICGRP constitutes a general rate increase, and consequently that this case must be governed by Ark. Code Ann. §§ 23-4-401 *et seq*. (Repl. 2002). I disagree.

Arkansas Code Annotated § 23-4-108 (Repl. 2002), the sliding-scale or escalator-clause statute at issue, permits the Commission to fix a sliding scale of rates, but it also must be just and reasonable. The statute provides:

> (a)(1) Nothing in this act shall be taken to prohibit a public utility from establishing or entering into an agreement for a fixed period for a sliding scale or automatic adjustment of charges for public utility service in relation to the dividends to be paid to stockholders of the public utility, or the profit to be realized, or its expenses of operation to be incurred, or other equitable or reasonable basis for the scale or adjustment if a schedule showing the rates under the arrangement is first filed with and approved by the commission.

> (2) Nothing in this section shall prevent the commission from revoking its approval at any time and fixing other rates and charges for the product or commodity or service if, after reasonable notice and hearing, the commission finds the existing rates or charges unjust, unreasonable, insufficient, or discriminatory.

(b) The commission shall have the power to fix a reasonable and just sliding scale of rates for public utilities.

*Id.*

Appellant further argues that Ark. Code Ann. § 23-4-108 must be read in harmony with Ark. Code Ann. § 23-4-406 (Repl. 2002), which provides:

> For the purpose of justifying the reasonableness of a proposed new rate schedule, a utility may utilize either an historical test period of twelve (12) consecutive calendar months or a forward-looking test period of twelve (12) consecutive calendar months consisting of six (6) months of actual historical data derived from the books and records of the utility and six (6) months of projected data which together shall be the period or test year upon which fair and reasonable rates shall be determined by the Arkansas Public Service Commission. However, the commission shall also permit adjustments to any test year so utilized to reflect the effects on an annualized basis of any and all changes in circumstances which may occur within twelve (12) months after the end of the test year where such changes are both reasonably known and measurable.

*Id.*

In *City of El Dorado, supra*, the dispute involved a tariff filed by Arkansas Louisiana Gas Company to increase the minimum monthly service charges on customers' meters from $1.17 to $1.87 based upon specific increases in costs of providing services.

The present case does not involve an escalator clause, as is provided in Ark. Code Ann. § 23-4-408, nor does it constitute a change in rates requiring the use of a fully developed rate case because there is no increase in the unit price of gas except for the surcharge. Here, the Commission exercised its authority by establishing a payment plan by which low-income customers with unusually high gas charges can pay back past-due accounts in installments. The language of the TLICGRP reads in part:

> 3. Debits and credits to be flowed through each Gas Companies' Purchased Gas Adjustment ("PGA") or Gas Supply Rate ("GSR") or by a bill line item shall be limited to the outstanding indebtedness of and payments received from only those customers actually enrolled in the TLICGRP. Eligible debits shall include not

only existing past due amounts when the customer enrolls in the TLICGRP, but also new unpaid debt incurred while the customer is a participant in the program for usage during the current winter heating season (defined as the billing period beginning November 1, 2001, and ending April 30, 2002). Credits shall include all payments received from any customer in the TLICGRP program toward the outstanding debt that has been debited to the PGA, GSR or bill line item as authorized herein, whether incurred prior to enrollment or during participation in the program. The gas companies shall be allowed to recover the total bad debt write-off for enrolled customers over a single twelve (12) month amortization period.

The language of the policy refers to the "outstanding debt" of the customer that may be paid off while enrolled in the TLICGRP. The basic rates for service were unchanged except for the provisions relating to the requirement that all utilities must cease efforts to collect past-due accounts owed by participating customers as part of a program to reconnect participating customers who had been cut off. It is important to note that those customers enrolled in the TLICGRP continue to pay their unpaid utility bills on an installment plan, and that the allowance for a surcharge for delinquent accounts is reduced as those unpaid accounts are paid.

Finally, the provisions of § 23-4-401(a) applies only when a public utility requests "a general change or modification in its rates and charges." Here, the TLICGRP was mandated by the Commission; the public utilities did not make a request that is contemplated by § 23-4-401(a).

For these reasons, I would hold that Ark. Code Ann. §§ 23-4-108 and 23-4-406 are inapplicable to the present case, and that the allegation that the Commission engaged in an illegal single issue ratemaking has no merit.

*Double Recovery of Bad-Debt Expense*

The majority expresses concern about the issue of double recovery of bad-debt expense, but refrains from reversing on this point. This issue requires more discussion.

Appellant argues that the TLICGRP unlawfully permits double-expense recovery. Specifically, appellant contends that the utilities' rates already include an allowance for bad debt, and that

the requirement of ratepayers to pay PGA or GSR tariffs for TLICGRP participants' unpaid bills is to impermissibly recover these bad-debt expenses twice. This contention does not take into account the fact that an agreement to pay an unpaid account on an installment plan does not transform that unpaid bill into a bad debt. Only when a participating customer defaults upon his or her agreement to pay past debts does the unpaid balance become a "bad debt," subject then to legal process for the collection of such bad debt. The TLICGRP provides that the utilities must maintain all records related to the TLICGRP program, and the Commission has the authority to require that there be no double dipping.

Appellant further argues that this practice violates Ark. Code Ann. § 23-4-103 (Repl. 2002). Arkansas Code Annotated § 23-4-103 provides:

> All rates made, demanded, or received by any public utility, for any product or commodity furnished, or to be furnished, or any service rendered or to be rendered, and all rules and regulations made by any public utility pertaining thereto shall be just and reasonable, and to the extent that the rates, rules, or regulations may be unjust or unreasonable, are prohibited and declared unlawful.

*Id.*

Here, the TLICGRP does not cover all bad debt attributable to all customers across the state, but only the unpaid bills owed by customers who enroll in the TLICGRP. As past-due payments are made on the installment plan by participating customers in the TLICGRP, those payments reduce the allowance for such unpaid accounts. The temporary surcharge is of limited duration while those TLICGRP customers pay off their past-due accounts, and eventually, the surcharge is eliminated upon receipt of the past-due balance. The Commission had before it the testimony of Robert Booth, the manager of the Commission's gas and water utilities section, that it was unlikely that a double recovery would occur. The Commission's findings of fact, based upon the testimony of an expert witness, shall be conclusive when supported by substantial evidence. *See Bryant v. Arkansas Pub. Serv. Comm'n,* 57 Ark. App. 73, 941 S.W.2d 452 (1997). There is an assurance that no double recovery would be allowed, and there is no evidence that the Commission will fail to assure this result.

This court has stated that it is the result reached, not the method employed, that is controlling, and it is not the theory, but the impact of the rate order that counts in determining whether rates are just, reasonable, lawful and nondiscriminatory. If the total effect of the rate order cannot be said to be unjust, unreasonable, unlawful or discriminatory, judicial inquiry is concluded, and infirmities in the method employed rendered unimportant. *Southwestern Bell Telephone Co. v. Arkansas Pub. Serv. Comm'n*, 267 Ark. 550, 593 S.W.2d 434 (1980) (citing *Federal Power Comm'n. v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)). Accordingly, I would hold that the Commission's order was reasonable and fair under Ark. Code Ann. § 23-4-103.

Because I have addressed the salient points that the Commission had the authority to implement the policy at issue, any further analysis of appellant's remaining points on appeal would be superfluous.

GLAZE and THORNTON, JJ., join this dissent.